## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mary Kay Thomas,                            Court File No.: _____

        Plaintiff,

v.                                          **COMPLAINT**
                                            **(JURY TRIAL DEMANDED)**

Marshall Public Schools (Independent
School District 413); Members of the
Marshall School Board (in their official
capacities); Jeff Chapman (in his individual
and official capacities); Bill Swope (in his
individual and official capacities); and
Superintendent Jeremy Williams (in his
individual and official capacities),

        Defendants.

Plaintiff, by her attorneys, Nichols Kaster, PLLP, brings this action for damages and other relief, stating the following as her Complaint against Defendants.

### <u>Introduction</u>

Mary Kay Thomas has been a teacher and principal for more than three decades. She is a career educator with a long track record of success. For fifteen years starting in 2006, Thomas was the principal at Marshall Middle School. Year after year, she received contract renewals, pay raises, and praise for her performance.

But when Thomas decided to display an LGBTQ Pride Flag in the school cafeteria in early 2020, everything changed. Within days of the Pride Flag going up, a small group of anti-LGBTQ middle-school staff, parents, students, and local clergy began efforts to

take the Pride Flag down. Ultimately, these efforts grew to include removing Thomas as principal: when she resisted taking the Pride flag down; when she made rainbow stickers available to middle-school staff; and when she backed a gay-straight student alliance at the school. In fact, following her public association with LGBTQ people and students, critics of Thomas have even compared her to the Devil. Sadly, the Marshall School District has sided with these critics.

By August 2021, the District had decided to take the Pride Flag down. In the meantime, it has subjected Thomas to an escalating series of adverse actions—including, but not limited to, threatening her employment, conducting a bad-faith employment investigation, putting her on an indefinite involuntary leave, suspending her without pay, and putting a notice of deficiency in her personnel file. Worse, the District has attempted to get Thomas to quit by removing her as middle-school principal, assigning her to a demeaning "special projects" position, and putting her on a humiliating year-long performance improvement plan.

## Parties

1.     Plaintiff Mary Kay Thomas is a resident of Marshall, Minnesota. She served as principal at Marshall Middle School ("MMS") between 2006 and 2021.

2.     Defendant Marshall Public Schools, Independent School District No. 413 ("MPS" or the "District"), is a public school district in Marshall, Minnesota. It is a recipient of federal funds.

2

3.      Defendant Members of the Marshall School Board are individuals who reside in Marshall, Minnesota and who serve on the school board for Marshall Public Schools.[1] Board Members acted under color of state law and exercised final policy-making authority when taking adverse employment action against Plaintiff.

4.      Defendant Jeff Chapman is a resident of Marshall, Minnesota. He is Chair of the Marshall School Board. Mr. Chapman is sued in his official and individual capacities. Mr. Chapman acted under color of state law and exercised final policy-making authority when taking adverse employment actions against Plaintiff.

5.      Defendant Bill Swope is a resident of Marshall, Minnesota. He is a member of the Marshall School Board. Mr. Swope is sued in his official and individual capacities. Mr. Swope acted under color of state law and exercised final policy-making authority when taking adverse employment actions against Plaintiff.

6.      Defendant Jeremy Williams is a resident of Marshall, Minnesota. He is Superintendent of MPS. Mr. Williams is sued in his official and individual capacities. Mr. Williams acted under color of state law and exercised final policy-making authority when taking adverse employment actions against Plaintiff.

7.      At all relevant times, MPS was Plaintiff's employer under applicable laws.

---

[1] Unless specifically stated otherwise, Marshall School Board Members are sued only in their official capacities as members of the school board.

## Jurisdiction and Venue

8.      This Court has original subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331.

9.      This Court has supplemental subject-matter jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

10.      This Court has personal jurisdiction over all named Defendants because they reside in Minnesota, and/or because they took adverse actions against Plaintiff in Minnesota.

11.      Venue is proper in the District of Minnesota because all Defendants reside in this District, and, separately, because a substantial part of the events giving rise to Plaintiff's claims occurred in the District. *See* 28 U.S.C. § 1391(b)(2).

## Factual Allegations

***People in the LGBTQ community are a historically marginalized group in and outside Marshall, Minnesota.***

12.      People are born into the LGBTQ community. Being a member of the LGTBQ community is not a choice. There is nothing wrong with being a member of the LGBTQ community. It is not a disorder.

13.      Yet, based on prejudice, people in the LGBTQ community are historically—and presently—the targets of discrimination, marginalization, and harassment because of their sexual orientation or gender identity. They are told they have a disorder; that living as themselves is wrong; and that they should seek to change themselves (if necessary) through so-called "conversion therapy."

14.     Conversion therapy is a misnomer. It is not therapeutic. To the contrary, efforts to somehow turn LGBTQ people into non-LGBTQ people have been categorically rejected as a "dangerous practice" by, among others, the American School Counselor Association, the American School Health Association, the American Academy of Pediatrics, the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American College of Physicians, and the American Association for Marriage and Family Therapy.[2]

15.     The discrimination, marginalization, and harassment suffered by people in the LGBTQ community extends to LGBTQ youth. In one recent example from Ohio, a gay middle-school student was attacked and choked with his Pride Flag at school.[3]

16.     LGBTQ youth in Minnesota schools—including MMS—are no exception.[4]

17.     Indeed, as reported in its 2019 School Climate Report, the *Gay, Lesbian, and Straight Education Network* (GLSEN) found that:

- Nearly 90% of LGBTQ students reported hearing one or more of the following anti-LGBTQ slurs used in school on a regular basis: "gay," "fag," "dyke," and other negative remarks relating to gender expression or identity.

---

[2] *See* "The Lies and Dangers of Efforts to Change Sexual Orientation or Gender Identity," *Human Rights Campaign*, at https://www.hrc.org/resources/the-lies-and-dangers-of-reparative-therapy (last accessed on September 30, 2021).

[3] *See* "Gay Middle School Student Attached, Choked with Pride Flag at School," *Out*, at https://www.out.com/crime/2021/6/01/gay-middle-school-student-attacked-choked-pride-flag-school (last accessed September 30, 2021).

[4] With respect to Minnesota students generally, *see* GLSEN School Climate Report (2019), at https://www.glsen.org/sites/default/files/2021-01/Minnesota-Snapshot-2019.pdf (last accessed September 30, 2021).

- Most LGBTQ students reported being the victim of verbal or physical harassment because of their association with the LGBTQ community.

    o In these cases, most students never reported the incidents to school staff. And of those who did, only 37% said it resulted in effective intervention.

- Almost half of LGBTQ students in Minnesota reported discriminatory policies or practices at their school during the past year.

- 75% of LGBTQ students could identify six or fewer supportive staff in their schools.

18.     The word "gay"—as used in phrases like "That's gay"—is a slur against people in the LGBTQ community.

19.     On information and belief, MMS students are forced to attend a school where the slur "gay" is used regularly.

20.     The words "fag" and "faggot" are slurs against people in the LGBTQ community.

21.     School Board Member Bill Swope has used the words "fag" and/or "faggot" in the presence of one or more principals, school board members, or faculty in the District.

22.     Further, on information and belief, MMS students are forced to attend a school where the slurs "fag" and "faggot" are used regularly.

23.     The word "lifestyle"—as used in phrases like "gay lifestyle" or "homosexual lifestyle"—is a slur against people in the LGBTQ community.

24.     As illustrated below, many people in Marshall who actively opposed the display of a Pride Flag in MMS routinely used the slur "lifestyle" to describe people in the LGBTQ community.

25.     A person *misgenders* another person when the former refers to the latter by a gendered pronoun with which they do not identify (e.g., calling a transgender girl a boy). When done intentionally, misgendering a form of anti-LGBTQ harassment and discrimination.

26.     On information and belief, in or around July 2021, Marshall Superintendent Jeremy Williams refused to allow a transgender student to use restrooms consistent with their gender identity. Williams did so even when informed he was breaking the law by discriminating against the student. And in attempting to justify the discrimination, Williams intentionally misgendered the student.

27.     As illustrated below, those who actively opposed the display of a Pride Flag at MMS stated that the District should remain "neutral" on whether it is okay to be a member of the LGBTQ community.

28.     Schools that attempt to placate anti-LGBTQ attitudes by adopting *neutrality* policies—or otherwise attempting to appear neutral regarding the worth and dignity of people in the LGBTQ community—create a breeding ground for anti-LGTBQ attitudes and harassment.

29.     For example, in the wake of several student suicides, the Southern Poverty Law Center and the National Center for Lesbian Rights sued the Anoka-Hennepin School

District over its "neutrality" policy in 2011. They alleged that Anoka-Hennepin's neutrality was to blame for what a national publication referred to as "one town's war on gay teens."[5]

30.     That same year, two girls who attended MMS committed suicide. News reports suggest that their suicides may have been, at least in part, the result of anti-LGBTQ bullying by other students at MMS.[6]

31.     If anti-LGBTQ bullying contributed to their suicides, these girls would be far from alone ten years later. A 2021 survey of LGBTQ youth across the United States found the following:

- 42% of LGBTQ youth "seriously considered" attempting suicide in the past year, including "more than half of transgender and nonbinary youth";

- 94% of LGBTQ youth reported that "recent politics" negatively impacted their mental health; and

- 70% of LGBTQ youth reported that their mental health was "poor" most of the time.

In addition, the survey found that LGBTQ youth who had "access to spaces that affirmed" their identities reported lower rates of suicide attempts.[7]

---

[5]*See* "One Town's War on Gay Teens," *Rolling Stone*, at https://www.rollingstone.com/culture/culture-news/one-towns-war-on-gay-teens-232572/ (last accessed September 30, 2021).

[6] *See* "Minnesota teens who committed suicide together may have been girlfriends," *Dallas Voice* at https://dallasvoice.com/watch-teen-couple-commit-suicide-minnesota/ (last accessed September 30, 2021).

[7] *See* "National Survey on LGBTQ Youth Mental Health," *Trevor Project*, at https://www.thetrevorproject.org/survey-2021/ (last accessed on September 30, 2021).

***Mary Kay Thomas is a long-time and very successful principal.***

32.     Mary Kay Thomas is a career educator.

33.     After earning a Bachelor's Degree in Secondary Education from Black Hills State University in 1987, Thomas spent 12 years as a middle-school teacher. During this time, she coached track and volleyball, earned a Master's Degree in Educational Administration, and was twice named to "Who's Who Among America's Teachers."

34.     For the past 22 years, Thomas has been a middle-school principal.

35.     In 2006, she earned an Educational Specialist Degree.

36.     For the past 15 years, she was the principal at MMS.

37.     For more than three decades as a teacher and principal, Thomas was never told her performance was deficient or unsatisfactory, put on a performance improvement plan, suspended, investigated, disciplined, threatened with termination, fired, or otherwise removed from a job.

38.     Instead, for more than three decades, Thomas consistently and repeatedly received high praise for her work in education.

39.     For example, in a reference letter, a former colleague and superintendent described Thomas as someone he would "readily recruit" to his new district because she is a "team player" who earns the "respect and admiration of her staff" and who "studies each issue and situation before rendering a decision."[8]

---

[8] Letter from Dr. Don Marchant, Superintendent of McCook Public Schools, Nebraska (February 20, 2003).

40.     In another reference letter, a former colleague and fellow principal described Thomas as a "pleasure to work with." Thomas is a "warm, caring individual" who maintains "open, friendly communication with staff, students and parents." Her ideas are "well thought out and student-centered," and she fosters a "team approach to teaching and learning."[9]

41.     In another reference letter, a former colleague and fellow principal described Thomas as a "very positive leader," a "true professional," "outstanding," "friendly," and "one of the finest individuals I have been associated with in my career."[10]

42.     In another reference letter, a former colleague and teacher under her supervision described Thomas as a "mentor and role model" who "maintains the highest levels of professionalism … and approachability." She also "consistently maintains high … expectations for students and staff." More broadly, in addition to academics, Thomas "expects the highest levels of responsibility and citizenship of students."[11]

43.     During her time at Marshall Middle School, Thomas served under three superintendents: Dr. Klint Willert (2006 to 2014), Scott Monson (2014 to 2020), and Jeremy Williams (2020 to present).[12]

---

[9] Letter from Kathy Lloyd, Principal, Lead-Deadwood Elementary School, Deadwood, South Dakota (February 2003).

[10] Letter from High School Principal Bruce K. Olson, Dell Rapids, South Dakota (March 15, 2006).

[11] Letter from Shane T. Wuebben, Director of Vocal Music, Dell Rapids, South Dakota (April 10, 2006).

[12] Dr. Willert had high expectations for principals and teachers in Marshall. As expressed on numerous occasions to Thomas, Dr. Willert's philosophy on teacher tenure decisions was: "If you have any questions or reservations about a teacher, cut 'em loose."

44.   No superintendent has ever rated Thomas as not meeting expectations.

45.   By 2014, MPS rated principals like Thomas on the following scale:

- 5 = **Distinguished** ("… consistently and significantly exceeds basic competence on standards of performance.")

- 4 = **Accomplished** ("… exceeds basic competence on standards of performance most of the time."

- 3 = **Proficient** ("… demonstrates basic competence on standards of performance most of the time.")

- 2 = **Developing** ("… demonstrates adequate growth toward meeting standards ….")

- 1 = **Unsatisfactory** ("… does not meet acceptable standards of performance.")

46.   In 2014, depending on the category, Dr. Willert rated Thomas as Distinguished, Accomplished, or Proficient. Her aggregate scores ranged from 3.18 to 4.62. And her overall score of 3.66 rated her as Accomplished.

47.   In particular, Dr. Willert gave Thomas the highest rating (Distinguished) for her ability to "model democratic value systems, ethics and moral leadership," "balance complex community demands in the best interests of learners," and "help learners grow and develop as caring, informed citizens."

48.   In his final review of Thomas, Dr. Willert commended Thomas for her "growth and development" as a principal, thanked her for all she did, and said she had "a promising future."

11

49.     In or around 2015, MPS began rating principals like Thomas on the following scale:

- 4 = **Distinguished**

- 3 = **Accomplished**

- 2 = **Satisfactory**

- 1 = **Unsatisfactory**

50.     In or around 2018, MPS continued using the same numerical scale to rate principals like Thomas, but changed the label for each score as follows:

- 4 = **Exemplary**

- 3 = **Effective**

- 2 = **Development Needed**

- 1 = **Unsatisfactory**

51.     Regardless of the rating system, from 2015 to 2019,[13] Thomas continued to receive positive performance reviews under new Superintendent Scott Monson. Monson consistently rated Thomas as Accomplished—and as approaching Distinguished or Exemplary.

52.     In Thomas's 2015 performance review, Monson wrote to Thomas that "I've been impressed with your skills and personality – especially … with your focus on students, your advocacy, and your willingness to seek improvements."

---

[13] Thomas did not receive a performance review in 2020.

53.     Monson further noted that staff survey results confirm "…that you have high expectations for students and staff, and that you are a compassionate and supportive administrator."

54.     In Thomas's 2019 performance review, Monson called Thomas a "Champion of Students," "… especially those who may be underrepresented, such as students of color or those [who] have difficult circumstances in their lives."

55.     Monson did not just express his positive view of Thomas in private performance reviews. He also did so in a letter of reference on her behalf. For example, he said:

- "It is a privilege to write a recommendation for [Mary Kay] and make others aware of the qualities I feel separate her from other administrators I've supervised and worked with."

- "While I could focus on several different skills and attributes Mary Kay has …, her professionalism, vision, and focus on all students [are what distinguish her]."

- Mary Kay holds herself and others to "high expectations";

- Mary Kay "understands the importance of leaving a positive and professional impression on everyone she interacts and comes into contact with";

- Mary Kay is "confident, yet not arrogant"; and

- Mary Kay is "serious" about her work, but also brings a "sense of humor" and "an upbeat and positive attitude to the workplace."

Monson concluded his letter by stating that Mary Kay is "a quality person, an outstanding educator and administrator, and a quick learner." And Monson said these things even though he did "not want to lose Mary Kay to another district."

56.     Like Monson, Jeff Chapman, Jeremy Williams, and others at MPS have spoken positively of Thomas in letters of reference.

***In late 2019, Thomas rejects and reports a sexual advance by Marshall School Board Member, Bill Swope.***

57.     Bill Swope is a former principal at Marshall Elementary School, a former executive director of the Pride in the Tiger Foundation, and a current member of the Marshall School Board.

58.     During and after their time as colleagues at MPS, Swope referred to Thomas by the pet-name, "Sweetness."

59.     On one occasion, at an administrators' meeting, Swope sat down next to Thomas, leaned over to her, and said: "I like it when you have your hair up, because I can see your neck, and I like to be able to see your neck."

60.     Years later, after leaving administration, Swope periodically showed up at Thomas's office to say hello and hand out Snickers candy bars.

61.     In December 2019, after giving Thomas a candy bar, exchanging pleasantries, and going in for a hug, Swope said, "Sweetness, I've wanted to do this for a long time; I'm going to kiss your neck."

62.     Still holding onto Thomas, Swope touched his face to hers and moved in to kiss her neck.

63.     Thomas reacted instinctively and immediately by pushing Swope out of her personal space—and, in the process, accidentally knocking Swope's glasses off his face to the floor.

64.     This was the last time Swope visited Thomas to say hello and offer her a candy bar.

65.     Thomas told Jeremy Williams about Swope's sexual harassment.

***In early 2020, Thomas publicly supports and associates with people in the LGBTQ community, comes under fire for her association, but remains steadfast despite threats to her employment.***

66.     In December 2019, as part of an Inclusion Project at MMS, Thomas approved a flag display in the school cafeteria.

67.     One aim of the flag display was to make members of minority or other historically marginalized groups feel welcome at MMS.

68.     As described above, LGBTQ people are members of a minority and historically marginalized group in the United States. This includes Marshall, Minnesota.

69.     Accordingly, as instructed by Thomas, a flag representing LGBTQ students and staff (i.e., the Pride Flag), a flag representing students and staff with disabilities, flags representing students and staff from countries outside the United States, and flags representing Native American students were put up in the MMS cafeteria during Winter Break.

70.     On January 2, 2020, students and staff returned to the middle school from Winter Break. That night, Thomas's administrative assistant told Thomas that a middle-school custodian was making negative comments about the Pride Flag to other staff in the building.

71.     On or around January 3, 2020, Emily Pollock, a Fifth Grade Teacher at MMS, asked Thomas to take the Pride Flag down.

72.     Pollock claimed to be acting on behalf of other teachers.

73.     At the time, Pollock was a building representative for the teachers' union. Among the reasons to take the Pride Flag down, as voiced by MMS teachers, Pollock explained that:

- Homosexuality "is not a nationality";

- Kids are "poking fun" and calling each other "gay";

- Some teachers are "not prepared" to answer questions inspired by the Pride Flag;

- Parents should have the right to decide how, when, and whether to "address, let alone support, this [LGBTQ] movement";

- Some teachers believed that the Pride Flag should not be displayed because they were not allowed "to display Christmas symbols";

74.     The other flags, Pollock said, "are just fine."

75.     Thomas declined Pollock's request to take down the Pride Flag. Likewise, local union president, Cathie Crouse, told Pollock that she "would not support any action to remove the flag."

76.    On January 5, 2020, Monica Doom, a paraprofessional at MMS, emailed Superintendent Monson to complain about the Pride Flag being up at the middle school.

77.    She wrote: "I was wondering, since we have the Gay Pride flag [sic] displayed …, if we could also display the Straight Pride flag …?" If so, Doom continued, she had a "sponsor who would purchase the flag."

78.    Monson forwarded the email to Thomas and told her to "take care of this."

79.    Thomas set up a meeting to speak with Doom. They met on January 7.

80.    During their meeting, Thomas explained why she would not take down the Pride Flag and would not put up a "Straight Pride" flag.

81.    That same day, Thomas sent an all-staff email regarding the Inclusion Project.

82.    She explained that "one of her personal/professional goals includes doing what we can as a building and individual to ensure all students feel INCLUDED and belong to MMS or MMS belongs to them." Thus, the Inclusion Project, wrote Thomas, was intended to address "several pockets of students that [recent feedback indicated] do not feel like they are a part of MMS."

83.    On or around January 8, 2020, a student at MMS started a petition to "take down LGTB [sic] Pride Flag."

84.    On the morning of January 8, 2020, Thomas emailed her daughter, Karrie Alberts, about getting "rainbow stickers" and signs that read "Proud to be an ally," which administrators and teachers could put up in their offices or classrooms at MMS.

85.     At the time, Alberts was a Spanish teacher and faculty advisor to the Gay Straight Alliance ("GSA") at Marshall High School.

86.     On January 9, Monson's Executive Assistant, Tricia Stelter, contacted Thomas to schedule an impromptu meeting with School Board Chair Jeff Chapman and Jeremy Williams.

87.     Stelter told Thomas that Chapman said he was calling the meeting to "divert a crisis."

88.     Chapman opened the meeting by stating that he wanted the Pride Flag down.

89.     He ultimately explained that Don LeClere had paid him a visit at Hy-Vee (where Chapman manages the deli) in which LeClere informed Chapman that the Pride Flag needed to come down.

90.     LeClere is Lead Pastor at the Evangelical Free (or "E-Free") Church in Marshall. He is or was also part of the group Marshall Concerned Citizens.[14]

91.     At the time of LeClere's visit to Hy-Vee, if not now, Chapman attended and belonged to LeClere's church.

---

[14] Marshall Concerned Citizens is or was an unincorporated association of people in Marshall, Minnesota. In April 2021, Marshall Concerned Citizens sued MPS and Mary Kay Thomas (in her official capacity as principal at MMS). Ostensibly, their primary goals in bringing the lawsuit were to (1) get MPS to take down the LGBTQ Pride Flag at MMS and (2) to get Plaintiff removed from her position as principal at MMS. Ultimately, with the cooperation of MPS, Marshall Concerned Citizens accomplished their goals.

92.     During the visit to the Hy-Vee deli, LeClere told Chapman that he represented several local clergymen, MMS teachers, and parents of MMS students who wanted the Pride Flag taken down.

93.     At LeClere's behest, Chapman implored Thomas to take the Pride Flag down to maintain what he referred to as "good community relationships."

94.     When Thomas refused Chapman's directive, he grew red in the face, increased the volume of his voice, and insisted that she take the Pride Flag down.

95.     After Thomas and Chapman went back and forth for several minutes, Stelter said that she was going to call Superintendent Monson.

96.     Monson participated in the remainder of the meeting via speaker phone.

97.     After more back and forth, Monson interjected: "We've talked about it now and are not getting anywhere. Jeff [Chapman], what do you want?"

98.     Again, Chapman insisted that Thomas to take the Pride Flag down.

99.     Monson said, "OK, you heard him Mary Kay [Thomas], take the flag down."

100.    Thomas replied, "I don't think I can do that. What if I don't?" To which Monson warned, "That would be insubordination and discipline would follow."

101.    After leaving the conference room, Thomas again tried to engage Chapman.

102.    Thomas said she still did not understand why Chapman was insisting she take the Pride Flag down. Chapman replied tersely: "I understand! The flag needs to come down."

103.    Thomas walked away from the meeting shaken and fearing for her job. As a result, Thomas told Monson that she would agree to take all of the flags down. But, she said, "I anticipate appealing the decision."

104.    After Thomas followed through by instructing building maintenance to take all of the flags down, Monson withdrew the demand.

105.    On or around January 9, 2020, a female student at MMS reported that a male student was harassing her about the Pride Flag and her association with LGBTQ students.

106.    At the time, Peter Thor was Assistant Principal at MMS. Thor refused to address the harassment because, he explained, it was based on the male student's "personal beliefs."

107.    When Thomas addressed the harassment directly and made a school record of it, Thor said that the harassment should not have been recorded, and he worried aloud about it becoming a "big" deal.

108.    On January 10, 2020, Thomas met with Monson. During the meeting, Monson bemoaned the fact that he now "had a board chair [Chapman] who won't even talk to me."

109.    "Off the record," Monson said, "while I might not agree with the LGBTQ lifestyle, I know that these thoughts don't belong in a public school."

110.    MPS administrators have counterparts they work with on the Marshall School Board.

111.    Chapman was Thomas's counterpart. Prior to their January 9th meeting, Chapman and Thomas talked regularly about school affairs. Following the meeting, Chapman stopped talking to Thomas.

112.    In mid-January, Thomas met with Don LeClere.

113.    At the meeting, LeClere confirmed that several MMS teachers had come to him asking for help getting the Pride Flag taken down.

114.    The teachers complained to LeClere that the Pride Flag promotes an LGBTQ "lifestyle" and requires them to explain to students what the flag means.

115.    The teachers further complained that it was wrong for Thomas to display the Pride Flag. And they implied that they may be unable to continue teaching at MMS if it did not come down.

116.    The teachers did not say the same things about any other flags in the display.

117.    LeClere told Thomas that he agreed with the teachers and that he would be going to Monson get the Pride Flag taken down.

118.    On information and belief, while Thomas was meeting with LeClere, Danielle Thor sent a text message to friends, teachers, and other "prayer warriors" who worked at MMS asking them to stop work and "pray hard to get the flag down."

119.    Mrs. Thor is a 6th Grade Science teacher at MMS. She is married to Peter Thor.

120.    Peter Thor is now the former Assistant Principal at MMS. He is currently a principal at a Marshall elementary school. On information and belief, the Thors attend LeClere's E-Free Church.

21

121.   In or around early January 2020, Mr. Thor told Thomas that, because the Pride Flag was displayed at MMS, he could not continue in his job at MMS and serve in a leadership position at his E-Free Church.

122.   On or around January 13, 2020, Grant Blomberg asked Thomas to take down the Pride Flag, or, alternatively, to put up other flags—such as a flag supporting "traditional" heterosexual families and the Gadsen "Don't Tread on Me" flag.

123.   In a subsequent email, Blomberg wrote the following to Thomas:

> "I sent you an email on Tuesday of last week and have not heard back from you! I would like to have some sort of Action or Answer for my question please. I guess if you are not willing to give me an answer … I will have to come and talk with you about this."

124.   Blomberg is married to Zana Blomberg; they are pastors at Open Door Assembly in Marshall; and they are or were part of the group Marshall Concerned Citizens.

125.   Sometime during the week of January 13, 2020, Thomas spoke with Jeremy Williams about the Pride Flag.

126.   Williams informed Thomas that his wife did not know if she could bring herself to set foot in MMS while the Pride Flag was displayed in the cafeteria.

127.   In disbelief, Thomas asked, "What?" And Williams repeated himself.

128.   On January 27, 2020, Pastor LeClere followed through on his threat to complain about the Pride Flag to Monson. In a contemporaneous letter, LeClere:

- Declared that he represented "several of our churches";

- Referred to the Pride Flag as "a single lifestyle flag" and griped that "only one sexual preference flag was chosen" to display;

22

- Accused Thomas of denying "straight kids the right to express their sexual preference" and subjecting straight kids to "discrimination" by forcing them to view the Pride Flag;

- Accused Thomas of "coerc[ing] the conscience of our students toward acceptance of a lifestyle that they believe is unacceptable"; and

- Accused Thomas of having an "agenda" to turn faculty into "advocates" by making "little LGBTQ flags available" to them;

129.    LeClere closed his letter by warning that the "division [caused by the Pride Flag and related speech] will only get worse," and praying that "wisdom would prevail and we could be spared a divided community over this issue finding common ground where we can stand together with diversity."

130.    On information and belief, during LeClere's meeting with Monson, Danielle Thor sent out another text message to her fellow "prayer warriors" asking them to pray to get the Pride Flag down.

131.    On February 3, 2020, at Monson's request, Thomas emailed him a proposed "process map" for deciding what flags were eligible to be included in the MMS Flag display.

- If a flag identified the home country of an MMS student or staff member, it was eligible.

- If a flag brought awareness to a disability or disease suffered by an MMS student or staff member, it was eligible.

23

- If a flag promoted equal treatment for all humans, positive social change, or environmental sustainability, it was eligible.

132.   Regardless, according to the process map, a flag was not eligible if it had been designed or adopted by a known hate/marginalizing group; if it promoted drugs, violence, or gang activity; or if displaying the flag would be unconstitutional (e.g., because displaying it in a public school would violate the separation of church and state).

133.   The Pride Flag promotes equal treatment for all humans.

134.   It was originally created to help address longstanding discrimination suffered by people in the LGBTQ community and the pernicious effects of such discrimination.

135.   The Straight Pride Flag was not created to promote equal treatment for all humans. More specifically, it was not created to address discrimination against heterosexuals. Instead, it was created in response to people in the LGBTQ community seeking equal treatment.

136.   On the evening of February 3, 2020, at a Marshall School Board meeting, numerous members of the community spoke for and against taking the Pride Flag down.[15]

137.   Around this time, after the media started covering the story, Thomas and her assistant received threatening and/or anti-LGBTQ voicemails on their school phones.

138.   On February 5, 2020, in response to anti-LGBTQ pressure from LeClere and others, Monson issued a statement in the *Tiger Insider* about the Pride Flag at MMS.

---

[15]   *See* Marshall Public Schools Board Meeting (02.03.2020) at https://www.youtube.com/watch?v=RQV6hco_fPM (last accessed on September 30, 2021).

139.    In the statement, Monson described "this 'topic' as a challenging and divisive one." And he sought to assure people that the District was remaining neutral on the "topic" and "not promoting, educating about, or advocating for the LGBTQ community."

140.    Monson's statement did not quell the anti-LGBTQ pressure.

141.    Four days later, on February 9, 2020, Bruce Saugstad emailed a letter to Monson and the Marshall School Board complaining about how divisive it was to display the Pride Flag at MMS "in the cafeteria where ALL students are influenced by what it represents…."[16]

142.    According to Saugstad, by displaying the Pride Flag, Thomas was failing to provide an "equal" and "safe" learning environment for all learners, because, he opined, the Pride Flag does not represent all sexual orientations:

> "such as heterosexual, one man/one women [sic] (based on equal and all for religious belief), single, demisexual (sexual attraction based on strong emotional connection), sapiosexual (sexually attracted to intelligence), pansexual (gender-blind sexual attraction to all people), omnisexual (similar to pansexual, but actively attracted to all genders), objectumsexual (sexual attraction to inanimate objects), asexual (someone who doesn't experience sexual attraction), and the list goes on."

143.    Saugstad was wrong: Thomas did not fail to provide an equal and safe learning environment for all learners by displaying the Pride Flag in the MMS cafeteria.

144.    On information and belief, Bruce Saugstad is or was part of Marshall Concerned Citizens.

---

[16] Emphasis in original.

145.   On February 14, a group of people sent a "petition" to the School Board demanding that MPS adopt a "viewpoint neutral process" for flying flags on school property, fly the Gadsen ("Don't tread on me") flag, and fly the National Organization for Marriage flag.

146.   Among those who consented to appear on the petition were Pastor LeClere, Bruce Saugstad, the Blombergs, and the parents of Danielle Thor.

147.   On the evening of February 18, 2020, at a second School Board meeting, numerous members of the community spoke for and against taking the Pride Flag down.[17]

148.   On February 20, 2020, a citizen of Marshall named Julie Enga emailed Thomas.

149.   In her email, Enga declared that "We were born children of God."

150.   She accused Thomas of "mentally abusing children" by "putting that flag up."

151.   And she implicitly threatened Thomas's job: "Adults that are abusing children should have no place in our school system."

152.   Toward the end of her email, Enga asked that her email be shared with the School Board. But she said, since "this is dividing, [sic] family and friends, [and] coworkers, I would like [my email] not to go public…."

---

[17]   Marshall   Public   Schools   Board   Meeting   (02.18.2020)   at https://www.youtube.com/watch?v=5YHDtkoMg6E (last accessed on September 30, 2021).

153.    On the evening of March 2, 2020, at a third School Board meeting, numerous members of the community spoke for and against taking the Pride Flag down.[18]

154.    In mid-March 2020, students at MMS started attending school remotely due to the COVID-19 pandemic. They did not return to full-time in-person school until early 2021.

155.    In early May 2020, Superintendent Monson submitted his resignation, and the School Board made Jeremy Williams interim superintendent.

156.    On June 1, 2020, the School Board went into closed session for the purpose of receiving legal advice regarding threatened litigation by Marshall Concerned Citizens.

157.    After returning to open session, the Board put out a statement acknowledging the community's concerns regarding the Pride Flag, but declining to take it down, at least, with the apparent threat of litigation still looming.

**After students return to MMS, anti-LGBTQ factions in MPS cooperate with Marshall Concerned Citizens to take the Pride Flag down and oust Thomas from her position at MMS.**

158.    Between March 2020 and October 2020, the firestorm regarding the Pride Flag died down while the world dealt with the COVID-19 pandemic and students attended school from home.

159.    When teachers, staff, and students returned to the school, it did not take long for the firestorm to heat back up.

---

[18]    *See* Marshall Public Schools Board Meeting (03.02.2020) at https://www.youtube.com/watch?v=ruEmYD6zPrY (last accessed on September 30, 2021).

160.    On or around November 2, 2020, MMS students and an MMS teacher started a Gay Straight Alliance ("GSA") at the middle school.

161.    Their efforts were met with anti-LGBTQ harassment, including the destruction of signs posted in the school to raise awareness about the group.

162.    On or around January 5, 2021, the School Board decided to disregard its customary practice of interviewing multiple finalists for administrative jobs in the district. Instead, at the suggestion of Bill Swope, the Board decided to simply make Jeremy Williams its permanent superintendent.

163.    On or around January 22, 2021, MMS teacher and faculty advisor to students in the middle-school GSA, Ellen Helgerson, spent time in a staff meeting talking about the new GSA.

164.    A few days later, fifth-grade teacher Nadine Weedman went to Superintendent Williams to complain about Thomas creating a "divisive" work environment at MMS. She said she believed displaying the Pride Flag was divisive.

165.    At the time, Weedman was upset about Thomas continuing to keep the Pride Flag up in the MMS cafeteria and passing rainbow stickers out to staff who supported LGBTQ students. Weedman was also upset about the number of announcements being made about the middle-school GSA.

166.    On information and belief, Weedman has told other MMS staff that she "[expletive] hates" Thomas.

167.   On or around February 5, Williams reported Weedman's concerns to Thomas. When Thomas asked Williams for examples or evidence, Williams said he did not have (or ask for) any.

168.   On or around February 17, 2021, Weedman again went to Williams to complain about Thomas creating a divisive work environment at MMS.

169.   This time she went with other MPS staff, including Emily Pollock, Ethan Hoppe, and Jill Gordon.

170.   Ethan Hoppe is a fifth-grade teacher at MMS. Hoppe has made one or more homophobic statements in school.

171.   Jill Gordon is a reading coach in MPS. On information and belief, Gordon wanted the Pride Flag taken down and took photos of it to show others who might help her.

172.   On information and belief, no later than February 2021, the District instructed one or more MMS staff members to spy on Thomas.

173.   In late February 2021, Williams reported staff concerns to Thomas. When Thomas asked Williams for examples or evidence, Williams again said he did not have (or even ask for) any.

174.   When Thomas told Williams that these are some of the same people who want the Pride Flag down, he nodded his head in agreement.

175.   Ultimately, Williams suggested to Thomas that he could "make this all go away" if she resigned or accepted re-assignment.

176.   Thomas refused, because, she explained, they were trying to sweep her support for LGBTQ students under the rug.

177.    On or around March 3, 2021, shortly after her refusal to resign or leave her position at MMS, Williams notified Thomas that he was putting her on an involuntary administrative leave pending an investigation into "workplace allegations that have been brought forward."

178.    Thomas was told the investigation and leave would only last 2 to 3 weeks. But the investigation did not conclude until mid-May, and the involuntary leave lasted into the summer.

179.    In the meantime, on March 6, 2021, Williams confirmed in the local newspaper that Thomas was on an involuntary leave pending investigation of unspecified allegations against her.

180.    In the weeks that followed, Thomas contacted the Minnesota Department of Human Rights (MDHR).

181.    On or around April 14, 2021, the MDHR sent Thomas a draft charge of discrimination for her signature.

182.    On April 19, 2021, Thomas signed and filed her charge of discrimination. It was cross-filed with the EEOC.

183.    Four days later, on April 23, 2021, the group calling itself "Marshall Concerned Citizens" filed their lawsuit against MPS and Thomas (in her official capacity as MMS Principal).

184.    On or around May 6, 2021, LGBTQ students, allies, and allied organizations met at a park in Marshall to march for equality.

185.    During the march, some members of the high-school and middle-school GSAs wrote messages with sidewalk chalk on the cement that supported people in the LGBTQ community. The messages included rainbows and peace-signs.

186.    Afterwards, Marshall Police Chief Jim Marshall complained to Jeremy Williams about having to clean up the sidewalk chalk, which he described as a "big mess."

187.    Chief Marshall is married to Allison Marshall. Mrs. Marshall is a math teacher at Marshall High School. Mrs. Marshall once suggested that Thomas's daughter must be gay because of how strongly she advocates for *those* kids. On information and belief, the Marshalls attend church with Williams.

188.    In response to Chief Marshall's complaint, Williams informed the faculty advisors of the high-school and middle-school GSAs that he was very disappointed in the behavior of their students.

189.    On May 11, 2021, MPS counsel issued its "Investigative Report" regarding Thomas.

190.    According to the Report, counsel was "unable to confirm or deny the validity of many of the specific factual allegations [against Thomas]," because the allegations were "vague," and because there was a "lack of concrete corroborating evidence."

191.    The Report also noted that some MMS staff called Thomas a "bitch" and some referred to her as "the Devil."

192.    Yet, MPS counsel then credited the vague allegations of her accusers without acknowledging, much less exploring, their known biases against Thomas, including their animus relating to her association with the LGBTQ community.

193.    Further, instead of recognizing and exploring the retaliatory animus of her accusers, counsel blamed Thomas for hurting their "feelings" and causing "division within the school … with the Pride Flag and rainbow support stickers."

194.    Over the next month, between May and June 2021, MPS left Thomas with the impression that they were going to fire her if she did not agree to resign and take a severance payment.

195.    On June 7, 2021, MPS held its annual awards ceremony. Thomas should have received an award at the ceremony for her fifteen years of service in MPS. She was not even invited to the event.

196.    On July 14, Williams issued a Notice of Deficiency against Thomas for the following purported reasons: 1) abusing her authority by coercing a faculty member to write her a letter of support; 2) requesting letters of support while on leave; 3) mishandling teacher non-renewal decisions; 4) creating a negative and harmful work environment; 5) failing to take responsibility for the foregoing deficiencies; and 6) engaging in conduct unbecoming of a principal "as detailed" in the foregoing deficiencies.

197.    These alleged deficiencies are false, distorted, and/or related to Thomas's association with members of the LGBTQ community.

198.    Based on these alleged deficiencies, MPS took the following adverse employment actions:

- Permanently removed Thomas from her position as MMS principal and hired a replacement;

- Kicked Thomas out of her office and into a new windowless space the size of a small walk-in closet;

- Suspended Thomas for seven days without pay;

- Threatened to terminate Thomas's employment if she did not "immediately give [her] attention to and correction of [sic] these deficiencies";

- Demoted Thomas to a "special projects" position that had never existed and that the District does not intend to make permanent; and

- Despite permanently removing Thomas as MMS Principal, putting her on a humiliating year-long "performance improvement plan" or PIP.

199. Among other things, the PIP demands that Thomas:

- Begin conducting herself in a "professional manner" (as if she had not previously);

- Read a book called *The Power of Positive Leadership*, prepare written summaries of what she learns from the book, and meet with Williams to discuss how to implement its lessons;

- Prepare a weekly summary of how she has spent her time during the week and bring the summaries to monthly meetings with Williams;

- Complete thirty-two (32) hours of training relating to "effective management," "interpersonal communication," "team building," and "anti-retaliation";

- Regain the trust of staff;

- Perform new duties to a high degree of competency;

- Meet all expectations of her employment; and

- Bring monthly summaries to meetings with Williams about what she had done that month to "work on [her] management and communication style."

Williams closed this part of the PIP by warning Thomas that her performance "will be closely monitored during the 2021-2022 school year," and, again, that he may terminate her if she does not meet "minimum standards."

200.    In light of these adverse actions, it was foreseeable that Thomas would leave employment with MPS. What's more, the District took these actions intending for Thomas to quit.

201.    On information and belief, the decision to take adverse employment action against Thomas—including removing her as MMS principal—was part of an effort by MPS to resolve the "Concerned Citizens" lawsuit.

202.    On or around July 24, 2021, the District attempted to get Thomas to sign a proposed settlement agreement resolving the lawsuit. It would have required the District to take the Pride Flag down.

203.    Thomas refused to sign the agreement because, she explained, the District was trying to settle the case on the backs of its LGBTQ students.

204.    In early August 2021, the School Board officially settled the "Concerned Citizens" lawsuit without Thomas's signature. In doing so, the District agreed to take the Pride Flag down. It has since done so.

205.    Thomas has not yet quit employment with MPS. But she does not know much longer she can last.

206.    As a result of Defendants' conduct, Thomas has suffered economic losses (including lost wages and/or benefits), emotional distress, humiliation and embarrassment, harm to dignity, loss of reputation, lost earning capacity, and other injuries.

207.    On September 27, 2021, Thomas filed an amended charge of discrimination with the MDHR. It was cross-filed with the EEOC.

208.    On or around November 10, 2021, the MDHR sent a letter to Thomas and Marshall Public Schools confirming that she has withdrawn her charge from the Department and exercised her right to seek redress through civil action.

209.    On November 24, 2021, Thomas received a notice of right-to-sue from the U.S. Department of Justice.

## CAUSES OF ACTION

### COUNT I
**Reprisal for Associating with Members of the LGBTQ Community**
*All Defendants*

210.    Plaintiff incorporates the foregoing paragraphs by reference.

211.    It is unlawful under the MHRA for an employer or person to engage in reprisal against someone because she opposed discrimination against, or otherwise associated with, people in the LGBTQ community.

212.    As described herein, Plaintiff engaged in protected activity under the MHRA.

213.    The persons involved in deciding to take adverse employment action against Plaintiff knew about her protected activity.

214.    Plaintiff's protected activity played a role in the decisions to take adverse employment action against her.

215.    As described herein, under the MHRA, Defendants engaged in unlawful reprisal against Plaintiff.

216.    As a result of Defendants' unlawful conduct, Thomas has suffered economic losses (including lost wages and/or benefits), emotional distress, humiliation and embarrassment, harm to her dignity, loss of reputation, lost earning capacity, and other injuries.

217.    Plaintiff is entitled to any and all relief available under the MHRA, including economic damages, compensatory damages, treble damages, punitive damages, attorneys' fees, costs, disbursements, and other equitable relief.

## COUNT II
### Reprisal for Rejecting Sexual Advances in Violation of the MHRA
*Defendants MPS, Bill Swope, and Jeremy Williams*

218.    Plaintiff incorporates the foregoing paragraphs by reference.

219.    It is unlawful under the MHRA for an employer or other person to engage in reprisal against someone because she opposed sexual harassment or rejected a sexual advance.

220.    As described herein, Plaintiff opposed sexual harassment and rejected a sexual advance.

221.   Two or more persons involved in deciding to take adverse employment action against Plaintiff, including Bill Swope and Jeremy Williams, knew about her protected activity.

222.   Plaintiff's protected activity played a role in the decisions of one or more people to take adverse employment action against her.

223.   As described herein, under the MHRA, Defendants engaged in unlawful reprisal against Plaintiff.

224.   As a result of Defendants' unlawful conduct, Thomas has suffered economic losses (including lost wages and/or benefits), emotional distress, humiliation and embarrassment, harm to her dignity, loss of reputation, lost earning capacity, and other injuries.

225.   Plaintiff is entitled to any and all relief available under the MHRA, including economic damages, compensatory damages, treble damages, punitive damages, attorneys' fees, costs, disbursements, and other equitable relief.

## COUNT III
### Associational Sex Discrimination in Violation of Title VII
#### *Defendant MPS*

226.   Plaintiff incorporates the foregoing paragraphs by reference.

227.   It is unlawful under Title VII for an employer to discriminate against someone because she associated with people in the LGBTQ community.

228.   As described herein, Plaintiff associated with people in the LGBTQ community.

229. Defendant MPS knew about Plaintiff's association with people in the LGBTQ community.

230. Defendant MPS took adverse employment action against Plaintiff because she associated with people in the LGBTQ community.

231. As described herein, Defendant engaged in unlawful discrimination against Plaintiff under Title VII.

232. Because Defendant committed the foregoing acts with malice or reckless indifference to Plaintiff's federally protected rights, she is also entitled to punitive damages.

233. As a result of Defendant's unlawful conduct, Thomas has suffered economic losses (including lost wages and/or benefits), emotional distress, humiliation and embarrassment, harm to her dignity, loss of reputation, lost earning capacity, and other injuries.

234. Plaintiff is entitled to any and all relief available under Title VII, including economic damages, compensatory damages, punitive damages, attorneys' fees, costs, disbursements, and other equitable relief.

**COUNT IV**
**Associational Sex Discrimination in Violation of Title IX**
*Defendant MPS*

235. Plaintiff incorporates the foregoing paragraphs by reference.

236. Title IX prohibits public schools that receive federal funds from discriminating against people, including employees, because they associate with members of the LGBTQ community.

237.    Defendant MPS is a public school that receives federal funds.

238.    As described herein, Plaintiff associated with people in the LGBTQ community.

239.    Defendant MPS knew about Plaintiff's association with people in the LGBTQ community.

240.    Defendant MPS took adverse employment action against Plaintiff because she associated with people in the LGBTQ community.

241.    As described herein, Defendant engaged in unlawful discrimination against Plaintiff under Title IX.

242.    Because Defendant committed the foregoing acts with malice or reckless indifference to Plaintiff's federally protected rights, she is also entitled to punitive damages.

243.    As a result of Defendant's unlawful conduct, Thomas has suffered economic losses (including lost wages and/or benefits), emotional distress, humiliation and embarrassment, harm to her dignity, loss of reputation, lost earning capacity, and other injuries.

244.    Plaintiff is entitled to any and all relief available under Title IX, including economic damages, compensatory damages, punitive damages, attorneys' fees, costs, disbursements, and other equitable relief.

## COUNT V
### Retaliation in Violation of Title IX
*Defendant MPS*

245.    Plaintiff incorporates the foregoing paragraphs by reference.

246.   Title IX prohibits public schools that receive federal funds from retaliating against people, including employees, because they oppose discrimination against students on the basis of sex, sexual orientation, and/or gender identity.

247.   As described herein, Plaintiff opposed discrimination against LGBTQ students.

248.   Defendant MPS knew that Plaintiff opposed discrimination against LGBTQ students.

249.   Defendant MPS took adverse employment action against Plaintiff because she opposed discrimination against LGBTQ students.

250.   As described herein, Defendant MPS engaged in unlawful retaliation against Plaintiff under Title IX.

251.   Because Defendant MPS committed the foregoing acts with malice or reckless indifference to Plaintiff's federally protected rights, she is also entitled to punitive damages.

252.   As a result of Defendant's unlawful conduct, Thomas has suffered economic losses (including lost wages and/or benefits), emotional distress, humiliation and embarrassment, harm to her dignity, loss of reputation, lost earning capacity, and other injuries.

253.   Plaintiff is entitled to any and all relief available under Title IX, including economic damages, compensatory damages, punitive damages, attorneys' fees, costs, disbursements, and other equitable relief.

<u>**COUNT VI**</u>
**Retaliation in Violation of the U.S. Constitution**
*Defendants MPS, MPS School Board Members, Jeff Chapman, and Jeremy Williams*

254.    Plaintiff incorporates the foregoing paragraphs by reference.

255.    The First and Fourteenth Amendments to the U.S. Constitution prohibit retaliation against public employees because they speak on matters of public concern. This includes opposing discrimination against, supporting, and/or otherwise associating with people in the LGBTQ community.

256.    Plaintiff spoke on matters of public concern by opposing discrimination against, supporting, and/or otherwise associating with people in the LGBTQ community.

257.    Because of Plaintiff's opposition to discrimination against, support for, and/or association with people in the LGBTQ community, Defendants, individually and collectively, took adverse employment actions against Plaintiff that deprived her of constitutionally protected rights to free speech, expression, and association. In taking these actions, Defendants acted under color of state law.

258.    Defendants had final policy-making authority to take adverse employment actions against Plaintiff.

259.    As a result of Defendants' unlawful conduct, Thomas has suffered economic losses (including lost wages and/or benefits), emotional distress, humiliation and embarrassment, harm to her dignity, loss of reputation, lost earning capacity, and other injuries.

260.     As described herein, Defendants engaged in unlawful retaliation against Plaintiff under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

261.     Plaintiff is entitled to any and all relief available under Section 1983, including economic damages, compensatory damages, punitive damages, attorneys' fees, costs, disbursements, and other equitable relief.

262.     Because Defendants committed the foregoing acts with malice or reckless indifference to Plaintiff's federally protected rights, she is also entitled to punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury under Rule 38(b) of the Federal Rules of Civil Procedure.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Mary Kay Thomas requests that the Court order judgment against Defendants as follows:

A. For an Order adjudging the practices and conduct of Defendants complained of herein to be in violation of the rights guaranteed to Plaintiff under federal and Minnesota law;

B. For an order reinstating Plaintiff to her position as MMS Principal;

C. For an award to Plaintiff against Defendants, jointly and severally, for the loss of any past and future income and benefits, humiliation, mental anguish, loss of reputation, emotional distress, lost earning capacity, and other harm, as required or permitted by law, and in an amount in excess of $75,000 to be determined at trial;

D. For an award of treble damages under the Minnesota Human Rights Act;

E.  For an award of punitive damages to Plaintiff and against Defendants, jointly and severally, as required or permitted by law, and in an amount to be determined at trial;

F.  For an award to Plaintiff and against Defendants, jointly and severally, for her attorneys' fees, costs, and disbursements incurred this action, as required or permitted by law;

G.  For an award of prejudgment interest and other interest on a judgment as required or permitted by law; and

H.  For such additional relief as the Court may deem just and equitable.

Dated: November 30, 2021

**NICHOLS KASTER, PLLP**

s/David Schlesinger
David E. Schlesinger, MN #0387009
       schlesinger@nka.com
Matthew A. Frank, MN #0395362
       mfrank@nka.com
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 256-3200
Fax: (612) 338-4878

**ATTORNEYS FOR PLAINTIFF**