## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mary Kay Thomas,                                          Case No. 21-cv-2581 (PJS/DJF)

        Plaintiff,

v.                                                                    **ORDER**

Marshall Public Schools et al.,

        Defendants.

This matter is before the Court on third-party movant Pemberton Law, P.L.L.P.'s ("Pemberton") Motion for Protective Order (ECF No. 43); Defendants' Motion for Protective Order (ECF No. 62); Plaintiff's Motion to Extend Discovery and Motion Deadlines (ECF No. 71); and Plaintiff's Motion to Compel (ECF No. 80). These disputes revolve around Plaintiff's request to depose Pemberton Attorney Joshua Heggem regarding the 2021 Investigation Report ("Report") he prepared on behalf of Defendants regarding Plaintiff's job performance, and Plaintiff's request for documents prepared by Heggem and Pemberton attorney Kristi Hastings. Defendants and Pemberton oppose these requests based on the attorney-client privilege and work product doctrine.

For the reasons given below, the Court will allow Plaintiff to depose Heggem about the investigation, its scope and design, the information collected and reviewed in the investigation, Heggem's findings and conclusions, and the bases for his conclusions. The Court grants the Motions for Protective Order (ECF Nos. 43, 62) to the extent Plaintiff seeks to inquire into Heggem's legal advice regarding whether to conduct the investigation, how to respond to the investigation findings and conclusions, and in all other respects. The Court grants Plaintiff's Motion to Compel (ECF No. 80) in part, requiring Defendants and Pemberton to produce

1

responsive documents and communications with respect to the investigation and Investigation Report. Based on Defendants' subject matter waiver of the privilege, the Court further orders the production of documents reflecting or describing communications with Hastings regarding whether to conduct the investigation, Defendants' decision to put Plaintiff on administrative leave, or the change in her position. Finally, the Court grants Plaintiff's Motion to Extend Discovery and Motion Deadlines (ECF No. 71) in part, by extending the discovery and non-dispositive motions deadlines to allow limited fact discovery as set forth in this Order, including forensic examination of the individual Defendants' personal electronic communications devices.

## I.    Background

### a.   Factual Allegations

This litigation arises out of Plaintiff's allegation that she was demoted from her position as principal of Marshall Middle School ("MMS") in retaliation for displaying an LGBTQ Pride Flag in the school cafeteria in 2020. (*See* ECF No. 35.) Plaintiff was the principal of MMS for 15 years prior to her demotion and alleges that, in her time as principal, she consistently received positive performance reviews without any indication that her job was in danger. (*See id.* at 9–12.)

In late-December 2019, as part of an inclusion project at MMS, Plaintiff approved the display of an LGBTQ Pride Flag in the school cafeteria to make members of historically marginalized groups feel welcome at MMS. (*Id.* at 15.) The flag was first displayed on January 2, 2020, and within days, school staff, teachers, students and local clergymen began to express their objections to Plaintiff's decision. (*Id.* at 16–19.) Plaintiff alleges then-Superintendent Scott Monson and School Board Chairs Jeff Chapman and Jeremy Williams, at the behest of a local clergyman, held a meeting with her on January 9, 2020 to request that she take the Pride Flag down. (*Id.* at 17–20.) Plaintiff feared reprisal if she did not comply, and ultimately instructed

2

building maintenance to take down all flags in the school, rather than single out the Pride Flag alone. (*Id.*)  Superintendent Monson ultimately withdrew the demand after Plaintiff instructed building staff to take down all flags.  (*Id.*)

Pressure continued to mount against the Pride Flag until March 2020, when the COVID-19 pandemic began, and immediately resurfaced when students returned to in-person learning in November 2020.  (*See id.* at 20–27.)  Sometime between January 2020 and the end of 2021, Superintendent Monson left and was replaced by Defendant Jeremy Williams.  In 2021, teachers began to raise concerns to Superintendent Williams that Plaintiff was creating a divisive environment at MMS.  (*Id.* at 28–29.)  Superintendent Williams approached Plaintiff about these complaints in February 2021.  Plaintiff alleges he did not provide her with any examples of how she was creating a divisive environment, other than nodding his head in agreement when Plaintiff asked whether the complaints were coming from people who wanted the Pride Flag to be taken down.  (*Id.* at 28.)  Superintendent Williams suggested she should resign or accept reassignment, which Plaintiff refused to do.  In early March 2021, Superintendent Williams notified Plaintiff she would be placed on involuntary administrative leave pending an investigation into these workplace allegations, which was to last two to three weeks.  (*Id.*)  Williams testified at his deposition that he decided an investigation was necessary to examine "performance concerns" the School Board had about Plaintiff.  (ECF No. 50-2 at 2–3.)

Superintendent Williams hired Pemberton to conduct the investigation, which it tasked to Heggem. (*See* ECF No. 50-1.)  Heggem conducted 19 interviews in the course of his investigation, including interviews with school district employees and school board members.  According to defense counsel, he likely did not provide any *Upjohn* warnings to interviewees to inform them that the school districted intended the interviews to be subject to the attorney-client privilege.

3

Although Pemberton is a law firm and Heggem is an attorney, Superintendent Williams did not identify Heggem as counsel for the district in communications with employees and directors being interviewed; instead, he referred to Heggem as an "outside investigator". (*See e.g.*, ECF No. 51 at 107.) All interviewees received Tennessen Notices in advance of their interviewees, however, which requested confidentiality for the purpose of "preserv[ing] the integrity of the investigation." (*Id.* at 109.)

The investigation ultimately took longer than the initial two- to three-week estimate and continued into May. During that time, Plaintiff signed and filed discrimination charges with the Minnesota Department of Human Rights and the EEOC on April 19, 2021, and on April 23, 2021, a group of citizens sued Marshall Public Schools and Plaintiff. (ECF No. 35 at 30.)

Heggem finished the Investigation Report on May 11, 2021, concluding he could not substantiate most of the allegations against Plaintiff, but finding it more likely than not that she created a negative work environment. (*See* ECF No. 51 at 18.) Plaintiff received a copy of the Report later that month. (ECF No. 50 ¶ 3.) Plaintiff states she had the impression she would be fired if she did not agree to resign and take a severance payment, but instead the school district demoted her to a "Special Projects" position that it does not intend to make permanent. (ECF No. 35 at 31–33.)

### b. Discovery Disclosures

Defendants produced the Report and its accompanying exhibits in discovery and acknowledge without qualification that the decision to demote Plaintiff was predicated directly on the results of the investigation. (*See, e.g.,* ECF No. 64 at 2, "Based upon the findings set forth in Heggem's report, Williams suspended Plaintiff without pay for seven (7) working days, issued her a Notice of Deficiency, and placed Plaintiff on a Performance Improvement Plan. To alleviate the

4

concerns that Heggem identified … Williams also reassigned Plaintiff to her current position as "Coordinator of Special Projects". (ECF No. 50-3 at 5–6, interrogatory answer stating "the decision to reassign Plaintiff was the result of the May 11, 2021, Investigative Report"; ECF No. 56 at 3, Williams' deposition testimony stating he "made decisions regarding Mary Kay Thomas's employment in reliance on [the] report").

Defendants have also produced:  (1) over 100 emails from Heggem to Defendants regarding the investigation; (2) Superintendent Williams' notes from a meeting with Heggem regarding the nature and scope of the investigation; (3) Superintendent Williams' notes from a meeting with Hastings on February 12, 2021 regarding Plaintiff's position; (4) Superintendent Williams' notes from a March 3, 2021 meeting with Hastings about the investigation; and (5) according to Plaintiff, hundreds of documents related to the Investigation Report. (*See* ECF Nos. 50 ¶ 6, 53 and 54.)  In addition, witnesses have provided deposition testimony about the Heggem March 3, 2021 meeting notes (ECF No. 56 at 6–7) and the Hastings February 12, 2021 meeting notes (*id.* at 8).  Defendants do not argue that any of these disclosures were inadvertent, and upon questioning at the motion hearing, confirmed unequivocally that they do not wish to claw back any of these documents.

### c.  Procedural History

#### i.  Motion to Compel

On May 9, 2023, Plaintiff moved to compel both Defendants and Pemberton to produce documents she asserts are related to Heggem's investigation and Investigation Report.  (ECF No. 80.)  Plaintiff served Defendants with the Requests for Production at issue in her Motion to Compel (ECF No. 83-1) on February 8, 2022—more than a year before she filed her Motion to Compel (*see* ECF No. 80).  Defendants served their responses and objections to the Requests for Production

on March 9, 2022.  They served their privilege log on September 27, 2022, which they replaced with a supplemental log on November 2, 2022 (ECF Nos. 83 ¶ 6; 83-3).  Plaintiff served a third-party Subpoena for Document Production on Pemberton on March 16, 2023 (ECF No. 50-8).  Pemberton served its objections on March 30, 2023, and its privilege log on April 5, 2023 (ECF Nos. 50 ¶ 5, 50-9 and 50-10).

Plaintiff seeks to compel Defendant and Pemberton to produce certain documents withheld on grounds of privilege as noted in their privilege logs.  She asserts this information is not privileged or protected because it is related to the investigation and the Investigation Report, and that Defendants have waived any otherwise applicable privilege or protection against producing it. (*See generally* ECF No. 82.)  Plaintiff seeks notes and documents constituting or reflecting communications between Defendants and Pemberton, including communications with attorneys Hastings and Heggem. (*See* ECF Nos. 83-4 and 83-6, highlighting the privilege log entries describing documents Plaintiff asserts are not privileged or protected.)  Plaintiff contends both Defendants and Pemberton arbitrarily asserted privilege over some documents related to the Report while disclosing many others that appear to be equally related to the Report.  (*See* ECF No. 82 at 4-5.)  Plaintiff argues Defendants cannot selectively disclose information to their advantage while withholding other relevant information on the same subject.  (*Id.* at 14.)

### ii.  Motion for Protective Order

Defendants and Pemberton each move for a protective order prohibiting Plaintiff from deposing Heggem.  (ECF Nos. 43, 62.)  On January 16, 2023, Plaintiff communicated to Defendants that she intended to depose Heggem regarding his investigation (ECF No. 50-4 at 3).  Defendants responded that Plaintiff would likely face motion practice if she sought to depose Heggem (ECF No. 50-4), but provided Plaintiff with Heggem's contact information to schedule

the deposition (ECF No. 50-5).  Plaintiff contacted Pemberton and Heggem on March 1, 2023 to inquire about Heggem's availability to sit for a deposition on March 30, 2023 (ECF No. 50-6). Pemberton's general counsel responded on March 8, indicating Heggem would be available on March 30 (ECF No. 50-7).  On March 14, however, Plaintiff informed Pemberton's counsel she intended to serve Pemberton with a document subpoena prior to the deposition, such that March 30 no longer worked (ECF No. 50-7).  Pemberton served its objections to the subpoena on March 30 and served its privilege log on April 5.  On April 10, Plaintiff requested new dates for Heggem's deposition (ECF No. 50-11 at 7).  On April 11, 2023, Pemberton notified Plaintiff for the first time that it would oppose any deposition of Heggem. (*Id*.)  Pemberton filed its Motion for Protective Order seeking to prevent Heggem's deposition on April 20, 2023 (ECF No. 43).  Defendants filed their Motion for Protective Order seeking the same relief on May 8, 2023 (ECF No. 62).

Plaintiff seeks to depose Heggem on the following topics: (1) the purpose of the investigation; (2) the investigation and interviews; (3) documents and communications related to the investigation and Investigation Report; (4) documents provided to Heggem as part of the investigation, including documents not included as exhibits to the Investigation Report; (5) the facts that led to Heggem's opinions included in the Investigation Report; (6) decisions regarding the scope of the investigation; and (7) the factual bases for the conclusions in the Report.  (ECF No. 49 at 7-8.)   Defendant and Pemberton seek protective orders prohibiting this deposition on the grounds that these subject areas are privileged under the attorney-client privilege or constitute protected information under the attorney work product doctrine.  (*See* ECF Nos. 45, 64.)

### iii.  Motion to Extend Discovery and Motions Deadline

Plaintiff seeks an extension of the fact discovery deadline to allow time: (1) to depose Heggem; (2) to "conduct other necessary discovery" upon receipt of any additional documents

disclosed upon resolution of her Motion to Compel; and (3) to investigate Defendants' possible spoliation of documents. (*Id*.) Plaintiff also seeks to extend the motions deadlines to allow these issues to be addressed in dispositive or non-dispositive motions.

The parties' motions concerning the deposition of Heggem and the production of documents are described above. With respect to spoliation, the record reflects that Plaintiff served interrogatories and requests for production of documents on Defendants on February 8, 2022. (ECF No. 74 ¶ 5.) Plaintiff deposed the Defendant school board members, Bill Swope and Jeff Chapman, on April 4 and 13, respectively, and deposed Defendant Williams on April 20, 2023. (*See* ECF Nos. 74-2, 75 and 76.) Defendants agreed to produce responsive text messages and emails from each deponent prior to his deposition (ECF Nos. 74 ¶ 10 and 74-1). Defendant Swope did not produce any text messages or emails, however, and did not search for any text messages or emails. He testified he deletes all of his messages and emails the day he receives or sends them, such that he had no messages to produce. (*See* ECF No. 74-2 at 4–9.) Defendant Williams produced just 15 text messages, in contrast with Plaintiff's document production, which included over 230 text messages between Williams and herself alone (ECF No. 74 ¶¶ 17–18). Williams testified he independently ran some search terms and produced the results of that search, but he did not appear to know whether he still had relevant text messages from an old phone he may have used during the relevant time-frame, and did not know if those text messages were transferred to his new phone or stored on Apple's iCloud storage system (ECF No. 76 at 4–5). Defendant Chapman did not produce any text messages or emails, claiming—like Swope—that he has a practice of not only deleting his text messages and emails every day, but also emptying the trash folder from his email account daily (ECF No. 75 at 3–7). He admitted he continued to delete text messages and emails from his phone after he received a litigation hold notice for this matter, but

alleged it was not an issue because he did not conduct business from his phone and would turn over any relevant messages or emails to Williams. (*Id.*) Plaintiff alleges she has received text messages authored by Chapman from third parties, however, which addressed subject matter directly relevant to this litigation, and which Chapman failed to produce (ECF No. 74-3 at 2–3). Based on the deponents' testimony and the arguments at the motions hearing, it does not appear that defense counsel played any direct role in supervising the collection and production of electronic messages from these Defendants.

Plaintiff raised concerns regarding Defendants' ESI production on April 28, 2023 by letter requesting information about when the custodians received litigation hold notices, how their devices and accounts were searched, and the steps defense counsel took to ensure the custodians did not withhold or delete responsive materials (ECF No. 74-4 at 2–3). Defendants' attorneys informed Plaintiff they distributed litigation hold notices to custodians on July 14, 2021, rejecting the suggestion that spoliation had occurred and arguing Defendants Swope and Chapman had nothing to produce in light of their stated practices of deleting all messages at the end of the day. (*See* ECF No. 74-5.)

## II.    Analysis

### a.   Motions for Protective Order

Defendants seek a protective order prohibiting Plaintiff from deposing Heggem on grounds that: (1) the Investigation Report and Heggem's recollections of the investigation and witness interviews are protected work product; (2) the attorney-client privilege attaches to any communications from Defendants to Heggem in the course of seeking legal advice with respect to whether to conduct the investigation, how to conduct the investigation, and what to do about the findings in the Investigation Report; and (3) Plaintiff seeks to ask irrelevant questions of Heggem.

(*See generally* ECF No. 64.)  Pemberton, in contrast, moves for a protective order solely on the ground that Plaintiff has not satisfied the test for deposing an opposing party's attorney articulated in *Shelton v. Amer. Motors. Corp.,* 805 F.3d 1323, 1327 (8th Cir. 1996).  (*See generally* ECF No. 45.)

Plaintiff argues Heggem's testimony is relevant because Defendants have acknowledged his investigation and Investigation Report were the basis for Plaintiff's demotion (*see generally* ECF No. 49; ECF No. 88).  She contends the work product doctrine does not apply because the Investigation Report was not prepared in anticipation of litigation, and further argues the attorney-client privilege does not apply because the Report was not prepared for the purpose of obtaining legal services or advice.  Plaintiff further argues Defendants' disclosures in discovery created a subject matter waiver with respect to the Investigation Report and related information, and that Defendants' reliance on the Investigation Report as a defense constitutes an implied waiver (*see generally* ECF No. 49; ECF No. 88).  Finally, Plaintiff argues the *Shelton* test is inapposite because Heggem does not serve as Defendants' counsel in this litigation (*see* ECF No. 49 at 12-13).

For the reasons given below the Court finds the *Shelton* test does not apply.  The Court further finds Defendants have waived whatever protection or privilege might otherwise apply under the work product doctrine or the attorney-client privilege with respect to Heggem's investigation and Investigation Report.  No waiver has occurred, however, with respect to any legal advice Heggem may have provided regarding whether to conduct the investigation or how to respond to the investigation findings and conclusions. The Court accordingly denies the protective order motions as to the Investigation Report and the design and execution of the investigation itself, but grant the motions in all other respects.

### i. The *Shelton* Test

Pemberton urges the Court to preclude Heggem's deposition based on the test articulated in *Shelton*. Under that test, depositions of "opposing trial counsel" are permitted only when "the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel …; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." 805 F.3d at 1327 (citations omitted). But *Shelton* expressly limited its analysis and test to "opposing trial counsel." *Id.*; *see also, e.g.*, *Oehmke v. Medtronic, Inc.*, No. 13-cv-2415 (MJD/JSM) (D. Minn. March 26, 2015) ("… *Shelton* prohibited depositions of opposing counsel when the information sought related to counsel's litigation strategy."), *aff'd*, 2015 WL 2242064 (D. Minn. May 12, 2015). Heggem is not Defendants' litigation counsel in this matter, and Pemberton cites no authority for expanding the test to situations such as this one, in which the attorney whose testimony is sought was involved only in a prior, concluded investigation. Indeed, the Eighth Circuit has made it clear that no such expansion of *Shelton* is permissible. *See Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 730 (8th Cir. 2002) (declining to apply the *Shelton* test to litigation that had concluded, because the test was intended to "protect against the ills of deposing opposing counsel in a pending case which could potentially lead to the disclosure of the attorney's litigation strategy"). The Court rejects Pemberton's invitation to apply the *Shelton* test to Heggem's proposed deposition testimony on these grounds.

### ii. The Work Product Doctrine

The parties dispute whether the work product doctrine attaches to Heggem's proposed deposition testimony regarding the investigation and Investigation Report. The work product

doctrine prevents "unwarranted inquiries into the files and mental impressions of an attorney" and "recognizes that it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusions by opposing parties and their counsel." *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 402 (8th Cir. 1987). "The scope of work product protection is broader than the protection the attorney-client privilege provides because the work product doctrine is not confined to confidential communications between an attorney and a client, but rather extends to protect all 'documents and things' prepared in 'anticipation of litigation or for trial.'" *Columbia Ins. Co. v. Tibbott*, No. 11-cv-1040 (PAM/SER), 2012 WL 13027067, at *5 (D. Minn. June 21, 2012) (quoting *Onwuka v. Fed. Ex. Corp.*, 178 F.R.D. 508, 512 (D. Minn. 1997)). Thus, "the party seeking protection must show the materials were prepared in anticipation of litigation, i.e., because of the prospect of litigation." *PepsiCo, Inc. v. Baird, Kurtz & Dobson LLP*, 305 F.3d 813, 817 (8th Cir. 2002) (citing *Binks Mfg. Co. v. Nat'l Presto Indus. Inc.*, 709 F.2d 1109, 1118–19 (7th Cir.1983)). To engage in this factual determination:

> [T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation.

*Simon*, 816 F.3d at 401 (quoting 8 C. Wright & A. Miller, Federal Practice and Procedure § 2024, at 198–99 (1970) (footnotes omitted)).

To be sure, "litigation may be anticipated long before it is actually commenced." *Safeco Prod. Co. v. Welcom Prod. Inc.*, No. 08-cv-4918 (JRT/JGG), 2010 WL 11252007, at *4 (D. Minn. Feb. 10, 2010). The work product doctrine also extends not just to documents prepared in anticipation of litigation, but to documents "prepared in anticipation of arbitration proceedings and other adversarial proceedings." *Nat'l Football League Players Ass'n v. Nat'l Football League*, 08-

cv-6254 (PAM/JJG), 2009 WL 10711633, at *2 (D. Minn. Apr. 7, 2009) (citations omitted).  But the materials "must be prepared after a 'specific threat' of litigation [or other adversarial proceedings] became 'palpable.'"  *Wells Fargo & Co. v. United States*, No. 10-cv-57 (JRT/JJG), 2013 WL 2444639, at *32 (D. Minn. June 4, 2013) (quoting *Black v. Pilot Travel Ctrs., LLC,* No. 09-cv-4170 (KES), 2011 WL 1828039, at *31 (D.S.D. May 12, 2011)).

Plaintiff contends the work product doctrine is inapplicable because Heggem did not conduct the investigation "in anticipation of litigation."  Defendants disagree.  They note that because Plaintiff was covered by the Teacher Tenure Act (Minn. Stat. § 122A.40), she was entitled to grieve any disciplinary action imposed against her through binding arbitration (ECF No. 64 at 12).  Accordingly, in their view, "every investigation into the alleged misconduct of a continuing contract/tenured employee carries with it the likelihood than the investigation could become the basis for discipline", which may be "challenged through grievance arbitration."  (*Id.* at 12-13.) But Defendants' argument proves too much.  Taken to its logical extreme, Defendants effectively argue that, so long as some legal process exists for an employee to challenge workplace discipline, any and all attorney-led investigations that might possibly lead to the use of such process are made "in anticipation of litigation" for purposes of the work product doctrine.  This is clearly not the law.  *See, e.g., Mission Nat'l Ins. Co. v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986) ("The inchoate possibility, or even the likely chance of litigation, does not give rise to the [work product] privilege."); *Unite States ex rel. Wollman v. Massachusetts Gen. Hosp.*, 475 F.Supp.3d 45, 61 (D. Mass. 2020) (generalized concern that employee might bring future lawsuit did not qualify attorney investigation for work product protection); *c.f. B.L. v. Schuhmann*, 18-cv-151 (RGJ/CHL), 2020 WL 6293582, at *9–*11 (W.D. Ky. Oct. 27, 2020) (investigation into alleged sexual harassment allegations against police officers did not qualify as work product when

investigator-attorney "made perfectly clear his work had nothing to do with defending the city" in litigation related to the allegations); *Marvin Lumber & Cedar Co. et al. v. P.P.G. Indus., Inc.*, 168 F.R.D. 641, (D. Minn. 1996) (mere involvement of attorney in investigation did not shield investigation from discovery under the work product doctrine).

Defendants proffer no evidence to suggest the threat of litigation in this or any other action surfaced at any point before Plaintiff filed discrimination charges with the Minnesota Department of Human Rights and the EEOC on April 19, 2021. (ECF No. 35 at 30; ECF No. 65-2.) There is no dispute that Heggem began his investigation weeks before that date. (*See, e.g.,* ECF No. 51 at 7, Investigation Report, describing March 2021 interviews.) And although Heggem designated the Investigation Report as "CONFIDENTIAL – SUBJECT TO ATTORNEY/CLIENT PRIVILEGE", he did not designate it as work product. The Investigation Report itself fails to mention any expectation or threat of future litigation. Instead, based on Defendant Williams' deposition testimony, he asked Heggem to conduct the investigation to address "performance issues" surrounding Plaintiff's tenure as principal (ECF No. 50-2 at 2–3). An employment investigation to determine whether an employee is unfit based on reported performance concerns is not conducted "because of litigation [or arbitration]." *Wells Fargo & Co.*, 2013 WL 2444639, at *32 (internal quotation and citation omitted). Defendants now seek to use the Investigation Report as the lynchpin of their defense in this action, but this fact does not alter the timeline or its original purpose. Because Defendants have offered no evidence to suggest Heggem conducted the investigation "because of the prospect of litigation," *PepsiCo, Inc.*, 305 F.3d at 817 (citation omitted), the work product doctrine does not apply.

### 1. Implied Waiver

Plaintiff additionally argues that—to the extent any work product protection might apply—Defendants impliedly waived it by resting their defense on the Investigation Report. To determine whether an implied waiver of work product protection has occurred, courts "must not only look at whether [the party seeking protection] intended to waive the privilege, but also whether the interests [of] fairness and consistency mandate a finding of waiver." *Pamida*, 281 F.3d at 732 (citing Wigmore, *Evidence in Trial at Common Law*, § 2327 at 636 (J. McNaughton rev. 1961)). "When a party seeks a greater advantage from its control over work product than the law must provide to maintain a healthy adversary system, the privilege should give way." *Id.* (quoting *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982)). Courts consistently find that an implied waiver occurs when the party seeking work product protection "place[s] the work of its attorneys squarely at issue" in the case. *See id.* This can occur when the party "relies on the work product as the basis for a claim or defense." *Benson v. City of Lincoln*, 343 F.R.D. 595, 609 (D. Neb. 2023). Such is the case, because when an employer places a workplace "'investigation at issue by asserting [it as an] affirmative defense,' … 'it would be fundamentally unfair for the plaintiffs for the plaintiffs to be required to meet an element of their prima facie case without sufficient information regarding the factual substance of that element.'" *Hervey v. Nelson*, 04-cv-4537 (MJD/RLE), 2006 WL 8443651, at *6 (D. Minn. Jan. 5, 2006) (quoting *Harding v. Dana Transport, Inc.*, 914 F. Supp. 1084, 1088–89 (D.N.J. 1996)). To apply work product protection in this context would allow it to be "wielded as a sword to advance the holder's interest, while depriving the opponent of the bases upon which the strategic considerations are premised[.]" *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P.*, 210 F.R.D. 673, 677 (D. Minn. 2002) (citing *United States v. Workman*, 138 F.3d 1261, 1263–64 (8th Cir. 1998)).

Defendants readily claim that the primary basis for Plaintiff's demotion was Heggem's Investigation Report (ECF Nos. 50-2, 50-3). In relying on Heggem's impressions and conclusions set forth in the Report as the primary basis for their defense, but simultaneously seeking to deprive Plaintiff of the opportunity to depose Heggem about those same impressions and conclusions, Defendants impermissibly attempt to wield the work product doctrine as both a sword and a shield. *See Minnesota Specialty Crops, Inc.*, 210 F.R.D. at 677. By putting Heggem's investigation and his impressions and conclusions arising from it at the very center of their defense, Defendants impliedly waived any work product protection that otherwise might have applied.

### 2. Subject-Matter Waiver

Defendants further waived any applicable work product protection by disclosing the Investigation Report and a significant number of other documents and communications related to the investigation. As a general rule, the "disclosure to an adversary waives work product protections as to items actually disclosed," *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997) (citation omitted), but "disclosure of some documents does not destroy work product protection for other documents of the same character." *Id.* (quoting Wright & Miller, § 2024 at 209) (emphasis omitted). However, an exception to this general rule exists when principles of fairness come into play. As codified in Rule 502(a) of the Federal Rules of Evidence:

> When the disclosure is made in a Federal proceeding or to a Federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if:
>
> (1) the waiver is intentional;
>
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
>
> (3) they ought in fairness to be considered together.

16

"The proper scope of subject matter waiver is a fact-intensive inquiry." *Shukh v. Seagate Tech., LLC*, 872 F. Supp. 2d 851, 854 (D. Minn. 2012) (citing *Fort James Corp. v. Solo Cup*, 412 F.3d 1340, 1349–50 (Fed. Cir. 2005)). "[A] court should find subject-matter waiver only in situations where the privilege holder seeks to use the disclosed privileged material for a tactical advantage in the litigation, but invokes the privilege to deny its adversary access to additional materials that could provide an important context for proper understanding of the privileged materials." *U.S. S.E.C. v. Welliver*, No. 11-cv-3076 (RHK/SER), 2012 WL 8015672, at *5 (D. Minn. Oct. 26, 2012); *see also* Fed. R. Evid. 502(a), Advisory Comm. Notes.

This is such a scenario. Defendants have intentionally disclosed the entirety of Heggem's Investigation Report, are relying on it in their defense, and have also intentionally disclosed Defendant Williams' notes from a meeting with Heggem regarding the scope and design of Heggem's investigation. Defendant Williams testified about the notes during his deposition without objection, and Defendants made clear at the motions hearing they are not seeking to claw back that disclosure as inadvertent. (*See* ECF Nos. 50-2 at 6–7; 53.) Defendants also intentionally disclosed over 100 of Heggem's emails. (*See* ECF No. 50 ¶ 6.) The Court cannot fairly allow Defendants to cherry-pick helpful information about the investigation while holding other information back in this fashion. To allow Defendants to rely on the Investigation Report and other Heggem communications tactically deployed in their key defense, but at the same time deny Plaintiff the right to depose Heggem about the nature of the investigation, its scope and his impressions, would be to deny Plaintiff "access to additional materials that could provide an important context for proper understanding of" the Investigation Report. *See Welliver*, 2012 WL 8015672, at *5. The Court thus concludes both implied and subject matter waivers apply with

17

respect to the Investigation Report, its purpose, scope, and design, and Heggem's impressions and conclusions.

###    iii.   Attorney-Client Privilege

Defendants claim, for purposes of this motion, that the attorney-client privilege bars disclosure of any of their communications with Heggem seeking advice about: (1) whether to conduct the investigation; (2) how to conduct the investigation; or (3) how to address the findings in Heggem's Investigation Report.  (ECF No. 64 at 24.)  The scope of the attorney client privilege is narrower than that of work product protection.  *Hervey*, 2006 WL 8443651, at *4.  Unlike the work product doctrine, which extends to protect all documents and tangible things prepared in anticipation of litigation, the attorney-client privilege protects only confidential communications between an attorney and the attorney's client.  *Id.*  The privilege applies only if:

> [T]he asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977) (quoting *United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358–59 (D. Mass 1950)).  The purpose of the attorney-client privilege is "to encourage full and frank communications between attorneys and their clients and thereby promote broader public interest in the observance of law and administration of justice."  *Upjohn v. United States*, 449 U.S. 383, 389 (1981). The party asserting the privilege bears the burden to provide a factual basis for its application.  *Triple Five of Minnesota, Inc. v. Simon*, 212 F.R.D. 523, 527 (D. Minn. 2002) (citing *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985)).

When an attorney conducts a factual investigation for a client, the investigation must be performed in connection with the provision of legal services for the attorney-client privilege to apply to any notes or memoranda documenting client interviews or other client communications in the course of the investigation. *See Upjohn*, 449 U.S. at 394–95; *see also, e.g.*, *Sandra T.E. v. Berwyn Sch. Dist. 100*, 600 F.3d 612, 619–20 (7th Cir. 2010) (collecting cases). When the attorney is not hired to provide legal services or advice and is doing work that "could have been performed just as readily by non-lawyers[,]" then the client is not a 'client' for purposes of the attorney-client privilege. *Diversified Indus., Inc.*, 572 F.2d at 603.

In evaluating whether an attorney-investigator is providing legal advice for purposes of the attorney-client privilege, courts have "emphasized the importance of the terms of engagement letter between the client and the investigator to determine the applicability of the privilege and whether legal advice was sought." *B.L.*, 2020 WL 6293582, at *6 (citing *Sandra T.E.*, 600 F.3d at 619; *Doe 1 v. Baylor University*, 310 F.R.D. 430, 436 (W.D. Tex. 2017)). Another factor courts consider in determining whether an attorney acted as counsel during the course of an investigation is if "the attorney[] provided so-called 'Upjohn warnings' emphasizing that the [attorney-investigator] represented the [client] and not the employee and that the [client] had control over whether the conversations remained privileged." *Sandra T.E.*, 600 F.3d at 620.

Defendants have not borne the burden of establishing Heggem acted in his capacity as legal counsel with respect to his communications with Defendants about how to conduct the investigation, its scope, his investigation findings, his conclusions, or the rationale for any conclusion in his Investigation Report. These are all topics Defendants might just as readily have retained a non-lawyer investigator to address, *see Diversified Indus., Inc.*, 572 F.2d at 603, and there is little evidence to support a finding that Defendants intended the investigation itself to fall

within the scope of the attorney-client privilege.  Defendants have not provided the Court with the terms of Heggem's engagement letter, making it impossible for the Court to assess whether the parties expected the privilege would apply.  *See, e.g.*, *Wartrell v. Purdue University*, 1:13-cv-99 (RLM/APR), 2014 WL 4261205 (N.D. Ind. Aug. 28, 2014) (finding an attorney-client relationship did not exist, in part, because the school-defendants asserting the privilege did not enter the engagement letter into the record for the Court to examine).  Moreover, defense counsel represented at the motions hearing that Heggem likely did not provide *Upjohn* warnings to interviewees.  The Tennessen Notice Defendants gave them indicated Heggem is an attorney, but it did not suggest Defendants hired him to provide legal advice.  Indeed, it explicitly contemplated disclosing the information Heggem collected to third parties, including "the Minnesota Department of Education, the Minnesota Attorney General, the Minnesota Department of Human Rights, law enforcement officials, or other individuals…."  (ECF No. 51 at 109.)  And in his communications with witnesses about the investigation, Defendant Williams did not indicate Heggem was acting in his capacity as the school district's attorney, but rather, identified him as "an outside investigator."  (*Id.* at 107; *see also* ECF No. 50 at 4-5, Williams' testimony that, to the best of his knowledge, neither he nor Heggem ever told witnesses Heggem was acting in his capacity as counsel for the school district.)

Other than the fact that Heggem marked the Investigation Report itself as attorney-client privileged (*see* ECF No. 51 at 2)—the significance of which Defendants negated by purposefully disclosing the Report in discovery—there are no documents before the Court suggesting Defendants retained Heggem to conduct the investigation in his capacity as attorney for the school district.  *See Sandra T.E.*, 600 F.3d at 619.  The record before the Court suggests the function of the investigator was not to advise Defendants about any potential legal concern, but to investigate

potential performance concerns about Plaintiff.  (*See* ECF No. 50-2 at 2-3.)  There is no dispute that Heggem worked for Pemberton and that Pemberton regularly provided legal advice to the school district in a variety of matters, but the evidence in the record before the Court is insufficient to support a conclusion that Heggem acted as counsel in designing and conducting the particular investigation at issue.  *Wartrell*, 2014 WL 4261205, at \*5 (finding the attorney-client privilege did not apply when attorney acted as an independent investigator and the record did not reflect the attorney "was giving legal advice by conducting the investigation and report").

The Court reaches a different conclusion, however, with respect to whatever legal opinions Heggem may have provided Defendants before the investigation regarding *whether to investigate,* and after it was over about *how to respond* to the investigation findings and conclusions.  These topics are not addressed in the Investigation Report, and more importantly, they stray into the province of professional advice ordinarily reserved for legal experts.  Because to the extent Defendants discussed these topics with Heggem they likely did so in reliance on his legal acumen, the Court cannot comfortably conclude Defendants might just as readily have retained a non-lawyer investigator to serve the same role.  *See Diversified Indus., Inc.*, 572 F.2d at 603.  The Court concludes for these reasons that the privilege applies with respect to Heggem's advice regarding whether to conduct the investigation and how to respond to the investigation findings and conclusions.

### 1.  Implied Waiver

Principles of fairness dictate a finding that Defendants have waived any privilege applicable to Heggem's communications with Defendants about the design, scope, findings, and conclusions reached in the Investigation Report.  Just as courts have found the work product privilege is impliedly waived in the interests of fairness when a party puts an investigation at issue

by relying on it as a defense, so too have they found the attorney-client privilege waived under these circumstances. *See, e.g.*, *Hervey*, 2006 WL 8443651, at *6 (citing *Worthington v. Endee*, 177 F.R.D. 113, 118 (N.D.N.Y. 1997)).  Defendants cannot fairly rely on the investigation as a defense in this litigation, and yet assert the attorney-client privilege to bar Plaintiff from probing into its scope and soundness.

Defendants have not yet waived the privilege with respect to whatever advice Heggem may have provided regarding whether to conduct the investigation or how to respond to the results, however.  Such a waiver in the future is certainly possible.  If Defendants were to argue, for example, that they put Plaintiff on administrative leave and ultimately moved her to the Special Projects position because Heggem advised them to do so, they would waive any applicable privilege with respect to those communications.  *United States v. Workman*, 138 F.3d 1261, 1263–64 (8th Cir. 1998) ("The attorney client privilege cannot be used as both a shield and a sword, and [the defendant] cannot claim in his defense that he relied on [the advice of counsel] without permitting the [plaintiff] to explore the substance of that advice.").  But unless Defendants open the door, the Court concludes an implied waiver on these topics has not occurred.

## 2. Subject Matter Waiver

Defendants' production of notes from Williams' meeting with Heggem about the scope and design of the investigation, along with emails between Heggem and Defendants about the investigation, further supports a finding of subject matter waiver with respect to the design, scope, findings, and conclusions from the investigation.  As Defendants intentionally disclosed these documents and they address overlapping subject matter, principles of fairness compel allowing Plaintiff to depose Heggem on these issues.  *See* Fed. R. Evid. 502(a), Advisory Comm. Notes; *Welliver*, 2012 WL 8015672, at *5.  Plaintiff points to no document disclosed in discovery,

however, which reflects or describes legal advice from Heggem regarding whether to conduct the investigation or how to respond to the investigation findings and conclusions.  The Court accordingly grants the Motions for Protective Order in part.  Plaintiff may depose Heggem about what happened during the investigation, its design and scope, his investigation findings and conclusions, and the factual bases for his conclusions.  The Motions for Protective Order are granted in all other respects.

### b.  Plaintiff's Motion to Compel Document Production

Plaintiff seeks to compel Defendants to comply with certain document requests that appear to be related to Heggem's investigation.  Plaintiff served Defendants with requests for document production on February 8, 2022 (ECF No. 83-1) and served Pemberton with a third-party subpoena on March 16, 2023 (ECF No. 50-8).  Defendants and Pemberton declined to produce the documents at issue and identified them as privileged in their privilege logs. (*See* ECF Nos. 83-4 and 83-6, highlighted privilege log entries.)  Plaintiff seeks documents reflecting communications between Defendants and Pemberton, including communications with Heggem and Hastings.  (*See id*.)

### i.  Waiver

Because the Court has already concluded neither the work product doctrine nor the attorney-client privilege attaches to Heggem's work on the investigation, and even if so, Defendants have waived both protections, Pemberton and Defendants must produce documents and communications that are responsive to these requests for production with respect to Defendants' communications with Pemberton regarding how to conduct the investigation, its scope and execution, Heggem's investigation findings and conclusions, or the rationale for any investigation conclusions.

For the above-stated reasons, the Court further finds that, unless otherwise waived, the attorney-client privilege applies to communications between Defendants and Pemberton regarding whether to conduct the investigation or how to respond to the results.  Based on the disclosures in the record before the Court, however, multiple subject matter waivers have indeed occurred.  First, Defendant disclosed Williams' notes describing meetings with Hastings on February 12, 2021 and March 3, 2021.  (ECF No. 54.)  The March 3 notes document Hastings' advice regarding Plaintiff's placement on administrative leave pending the outcome of Heggem's investigation.  (*Id.* at 2, "OK leave pending investigation".)  The February 12 notes document Hastings' advice regarding how to manage the creation of a new position for Plaintiff, including the statement "MK resigns" and discussing rehiring.  (*Id.* at 3, "how do we fill for remainder of year?".)  Defendants also disclosed the transcript of a closed school board meeting on March 1, 2021, during which Hastings advised Defendants to retain Heggem and conduct the investigation.   (ECF No. 65-1 at 6, "I do think we have to get to the bottom of those complaints and figure out what's going on in -- in the middle school.  And our -- our tool to do that is an investigation.")  Defendants' purposeful decision to disclose these documents and use them to their advantage in the litigation opens the door to discovery regarding Hastings' legal advice as to whether to conduct the investigation, to put Plaintiff on administrative leave pending its outcome, and to effect a change in Plaintiff's position at the school.  *See S.E.C. v. Welliver*, No. 11-cv-3076 (RHK/SER), 2012 WL 8015672, at *5 (D. Minn. Oct. 26, 2012) (courts should find subject-matter waiver when the privilege holder seeks to use the disclosed privileged material for a tactical advantage, but invokes the privilege to deny its adversary access to additional materials that could provide necessary context to understand those materials).

### ii.  Rule 502(d)

Notwithstanding their purposeful decision to disclose otherwise privileged materials, Defendants argue the Pretrial Scheduling Order ("PTSO") forecloses granting Plaintiff's Motion to Compel.  The PTSO states:

> The production of privileged or work-product protected documents, electronically stored information ("ESI") or information, whether inadvertent or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding. This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).

(ECF No. 18 at 5 ¶ 8.)

Federal Rule of Evidence 502(d) provides that a "federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court— in which event the disclosure is also not a waiver in any other federal or state proceeding." Defendants argue that because Rule 502(d) applies to intentional as well as inadvertent disclosures of privileged material, their intentional disclosure of privileged documents does not result in a waiver as provided under the PTSO. (ECF No. 90 at 4–5.)

In making this argument Defendants flagrantly overread Rule 502(d). "The Rule 'is designed to enable a court to enter an order … that will allow the parties to conduct and respond to discovery expeditiously, without the need for exhaustive pre-production privilege reviews, while still preserving each party's right to assert the privilege *to preclude use in litigation* of information disclosed in such discovery.'" *Sleep No. Corp. v. Young*, 20-cv-1507 (NEB/ECW), 2021 WL 5644322, at *18 (D. Minn. Dec. 1, 2021) (emphasis added) (quoting Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence, 154 Cong. Rec. H. 7817 (2008), reprinted in Fed. R. Evid. 502 Advisory Committee Notes subdivision (d)).

While Rule 502(d) allows a party who discloses privileged material to claw them back without having to prove the disclosure was "inadvertent", it does not sanction the tactical, selective disclosure of some privileged materials for use in litigation while withholding others on the same subject.  *See, e.g.*, *XY, LLC v. Trans Ova Genetics, Lc,* 2018 WL 11000694, at *4-*6 (D. Colo. May 14, 2018); *Potomac Elect. Power Co. and Subsidiaries v. United States*, 107 Fed. Cl. 725 (2012); *Smith v. Best Buy Stores, L.P.*, 2017 WL 3484158, at *3 (D. Idaho Aug. 14, 2017).  Stated another way, the Court's PTSO allows the parties to claw back any privileged materials they might have produced without waiver *as to the disclosed materials only*; it has no bearing on whether the purposeful disclosure of privileged materials for use in litigation will create a waiver as to any *other* materials.  Since Defendants made it clear at the motions hearing that they did not wish to claw back any of the privileged materials they previously disclosed, they cannot avail themselves of the PTSO and Rule 502(d) to mitigate their waivers.

For these reasons, the Court grants Plaintiff's Motion to Compel to the extent she seeks documents reflecting or describing Defendants' communications with Pemberton regarding how to conduct the investigation, its scope and execution, Heggem's investigation findings and conclusions, or the rationale for any such conclusions.  The Court further grants Plaintiff's motion to the extent she seeks documents reflecting or describing Hastings' advice or communications with Defendants regarding whether to conduct the investigation, the decision to put Plaintiff on administrative leave during the investigation, or the change in Plaintiff's position at the school. The Court denies Plaintiff's motion in all other respects.

### c.  Motion to Extend Discovery and Motion Deadlines

Plaintiff seeks an additional 60 days from the Court's decision on these motions: (1) to depose Heggem; (2) to "conduct other necessary discovery" upon receipt of any additional

documents disclosed upon resolution of her Motion to Compel; and (3) to investigate Defendants'
possible spoliation of documents.  (*Id.*)  Plaintiff's motion also seeks to extend the motions
deadlines to allow these issues to be addressed in dispositive or non-dispositive motions.  At the
time of the May 23, 2023 hearing on the motions presently before the Court (*see* ECF No. 96), the
dispositive motions deadline was July 21, 2023 (ECF No. 34).  On May 24, 2023, the Court
extended the dispositive motions deadline to November 27, 2023 (ECF No. 97).  Because the Court
orders that Plaintiff may depose Heggem and is entitled to receive and review certain documents
withheld as privileged as set forth above, the Court grants Plaintiff's motion to extend the fact
discovery deadline, but the Court denies Plaintiff's vague request for permission to conduct "other
necessary discovery" upon receipt of the additional documents so ordered.  The Court's Pretrial
Scheduling Order instructed that fact discovery must be conducted "in time to be completed" on
or before the fact discovery deadline.  (ECF No. 18 at 3.)  Although the Court extends that deadline
to accommodate additional discovery as explicitly permitted by to this Order, the Court finds no
cause to extend the fact discovery deadline for any other purpose.

The Court will, however, allow limited discovery into the sufficiency of Defendants'
electronic document production with respect to any text messages or emails contained in personal
devices possessed by Defendants Swope, Chapman or Williams.   The Court permits additional
discovery into this issue because defense counsel's representations that no such responsive
documents exist are not persuasive.  "[P]arties are not expected to meet a standard of perfection in
the preservation and production of documents, particularly where ESI is implicated." *Claredi
Corp. v. SeeBeyond Tech. Corp.*, 4-04-cv-01304 RWS, 2010 WL 11579710, at *2 (E.D. Mo. Mar.
8, 2010), *report and recommendation adopted in part*, 2010 WL 11579799 (E.D. Mo. Mar. 31,
2010). "Rather, the standard is one of reasonableness; has the party taken reasonable steps under

the circumstances of the case to preserve that which is reasonably related to the subject matter of the litigation and thus potentially subject to discovery." *Id.* (citing *Wm. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443, 1555 (C.D. Cal. 1984)).

Though custodian self-collection of ESI can save on costs and allow for a more efficient discovery process, "custodial self-collection can be a risky move" because clients may fail at: identifying all sources of responsive information, preserving all evidence subject to a litigation hold, finding or providing all the necessary ESI evidence due to lack of expertise or out of sheer self-interest, and fail at fully documenting how they conducted their searches such that their counsel is unable to defend an alleged lack of production. *See DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 935–38 (N.D. Ill. 2021) (collecting cases and articles highlighting the problems and pitfalls of self-collection as a means of meeting ESI discovery obligations).

Here, it is evident such pitfalls have arisen. Defense counsel admits to having little direct involvement in collecting the individual Defendants' text and email messages from their phones, tablets and other personal devices. Defendant Williams testified at his deposition that he searched his own phone for text messages based on a keyword list provided to him (ECF No. 76 at 4). Williams further explained that he changed his iPhone to a newer model at some point and was unsure whether relevant messages were contained on the old phone, whether they transferred to his new phone, and whether any of his old messages were backed up to Apple's iCloud storage service. (*See id.* at 5.) Defendant Swope admitted he did not even search for responsive text messages or emails, claiming he has a daily practice of deleting not only the text messages and emails in his inbox, but also any deleted messages (ECF No. 74-2 at 2–10). He further admitted he continued to delete all material off his personal phone, despite the litigation hold, on grounds

that he forwarded any relevant information to Williams. (*Id.* at 8–9.)  Defendant Chapman similarly testified that he was aware of the litigation hold in this matter, but he continued his practice of deleting everything from his personal devices because he did not conduct school business on them.  (ECF No. 75 at 6–7.)

In total, Defendants produced just 15 text messages from Williams and no text messages from either Chapman or Swope.  The absence of documents is not alone sufficient to prove spoliation.  In this case, however, Plaintiff alleges—contrary to Chapman's claim that he never used his phone for school business—she received text messages produced by third parties who communicated with Chapman on his phone about matters relevant to this litigation. (*See* ECF No. 73 at 7.)  Plaintiff further states she produced over 230 text messages between herself and Williams alone, suggesting his search for Williams' text exchanges with Plaintiff and other witnesses may have been inadequate.  And Swope has essentially admitted he failed to conduct an appropriate search.  Neither defense counsel nor any individual Defendant has even intimated that they attempted to collect ESI from the Defendants' personal devices in a forensically sound manner. The Court is compelled to conclude that Defendants have not taken reasonable steps to preserve and collect this evidence, such that judicial intervention is necessary.

The Court accordingly requires defense counsel, no later than 7 days of the date of this Order, to collect all phones, tablets and other personal devices used by Defendants Swope, Chapman and Williams for electronic communication, and to bring the devices to a third-party ESI vendor for imaging.  Defense counsel shall also identify and disclose any cloud storage locations in which messages sent or received by these devices might be housed, and shall provide the vendor with whatever information is necessary to access those locations.  Defendants are prohibited from deleting any text messages, emails or other communications from their personal devices following

the entry of this Order, and any such deletion will be deemed a direct violation of this Order, which may result in sanctions.

Once the devices are imaged, they may be returned to their owners to minimize inconvenience.  The Court further instructs the parties to meet and confer regarding the parameters and search terms to be used to search the devices and any cloud storage associated with them, which defense counsel must provide to the vendor so that search results may be produced without undue delay.  To the extent the parties may have reached a previous agreement regarding ESI search terms, the Court strongly encourages the parties to use the same terms.  Any communications to or from Ratwik Roszak & Maloney, P.A.—Defendants' litigation counsel— shall be excluded from the production and need not be logged in Defendants' privilege log. Communications with Pemberton shall be produced to the extent consistent with this Order or logged if withheld on grounds of privilege.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.  Pemberton's Motion for a Protective Order (ECF No. [43]) and Defendants' Motion for Protective Order (ECF No. [62]) are **GRANTED IN PART AND DENIED IN PART** as follows:

    a.  Plaintiff may depose Heggem about what happened during the investigation, its design and scope and execution, his investigation findings and conclusions, and the factual bases for his conclusions.

    b.  The Motions for Protective Order are granted in all other respects.

2.      Plaintiff's Motion to Compel (ECF No. 80) is **GRANTED IN PART AND DENIED IN PART** as follows:

    a.  Pemberton and Defendants shall produce all documents, materials and communications withheld on grounds of attorney work product or attorney-client privilege to the extent they reflect or relate to what happened during the investigation, its design and scope or execution, the investigation findings and conclusions, or the factual bases for the conclusions.

    b.  Pemberton and Defendants shall produce all documents, materials and communications withheld on grounds of work product or attorney-client privilege to the extent they include, reflect or describe Hastings' advice or communications with Defendants regarding whether to conduct the investigation, the decision to put Plaintiff on administrative leave during the investigation, or the change in Plaintiff's position at the school.

    c.  Pemberton and Defendants shall produce the documents described in Paragraphs 2(a) and 2(b) no later than **September 26, 2023**.

    d.  Plaintiff's Motion to Compel is **DENIED** in all other respects.

3.      Defendants Swope, Chapman and Williams shall produce, for forensic examination, all personal devices used by each of them for text, email or other forms of electronic communication, and shall facilitate access to any cloud storage associated with these devices, as follows:

    a.  Defense counsel shall collect the devices and deliver them to a neutral ESI vendor for imaging by **September 13, 2023**.

b. Defense counsel shall identify any cloud storage locations associated with the devices and provide the ESI vendor with whatever information is necessary to access and search the cloud storage locations by **September 20, 2023**.

c. The parties shall meet and confer regarding the parameters and search terms to be used to search the devices and any associated cloud storage, which defense counsel must provide to the vendor so that search results may be produced without undue delay no later than **September 20, 2023**.

d. Communications to or from Ratwik Roszak & Maloney, P.A.—Defendants' litigation counsel—shall be excluded from the production and need not be logged in Defendants' privilege log.

e. Communications with Pemberton shall be produced to the extent consistent with Paragraph 2 of this Order or logged if otherwise withheld on grounds of privilege.

f. Any deletion of text, email or other communications from the devices following the entry of this Order will be deemed a direct violation of the Order, which may result in sanctions.

4. Plaintiff's Motion to Extend Discovery and Motion Deadlines (ECF No. [71]) is **GRANTED IN PART AND DENIED IN PART** as follows:

a. The fact discovery deadline is extended to **November 6, 2023** for the following limited purposes:

i. The production of documents described in Paragraphs 2(a) and 2(b) of this Order;

ii. The deposition of Joshua Heggem; and

iii.   The production of ESI as described in Paragraph 3 of this Order.

b.   The fact discovery deadline shall remain closed except as set forth in Paragraph 4(a) of this Order.

c.   The non-dispositive motions deadline is extended through **November 6, 2023** for the limited purpose of enforcing the provisions of this Order.  The non-dispositive motions deadline shall remain closed in all other respects.

d.   The parties shall contact the chambers of Chief District Judge Patrick Schiltz no later than **September 13, 2023** to obtain a new hearing date and briefing schedule for dispositive motions.  The undersigned Magistrate Judge will enter an order extending the dispositive motions deadline upon notification of the new hearing date.


Dated: September 6, 2023                          *s/ Dulce J. Foster*
                                                  Dulce J. Foster
                                                  United States Magistrate Judge