UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

MARY KAY THOMAS,                          Case No. 21-CV-2581 (PJS/DJF)

                    Plaintiff,

v.

MARSHALL PUBLIC SCHOOLS,
Independent School District 413;
MEMBERS OF THE MARSHALL SCHOOL                ORDER
BOARD, in their official capacities; JEFF
CHAPMAN, in his individual and official
capacities; BILL SWOPE, in his individual
and official capacities; and
SUPERINTENDENT JEREMY WILLIAMS,
in his individual and official capacities.

                    Defendants.

_____

     David E. Schlesinger and Riley Palmer, NICHOLS KASTER, and Matthew
     A. Frank, PREMO FRANK PLLC, for plaintiff.

     Timothy A. Sullivan and Jordan Soderlind, RATWIK, ROSZAK &
     MALONEY, P.A., for defendants.

     Plaintiff Mary Kay Thomas brought this action against defendants, alleging that

she was a victim of employment discrimination and retaliation in violation of federal

and state law.  This matter is before the Court on the parties' cross-motions for

summary judgment.  For the reasons that follow, plaintiff's motion is denied, and

defendants' motion is granted.

I.  BACKGROUND

The Court recounts the facts in the light most favorable to Thomas:

Thomas was the principal of Marshall Middle School from 2006 until 2021, when she was involuntarily reassigned to an administrative position within the school district.  Thomas Decl. ¶¶ 4, 21, ECF No. 134.  Prior to becoming the middle-school principal, Thomas was a middle-school teacher for 12 years.  Thomas Decl. ¶ 3.  Throughout her tenure as principal, Thomas received generally positive reviews from multiple superintendents, as well as generally positive feedback from her staff.  Schlesinger Decl. Ex. 2; Thomas Decl. ¶ 5.  In particular, Thomas—who describes herself as a "straight, cisgender woman," Thomas Decl. ¶ 20—was praised for being a "champion" of disadvantaged groups within the middle school.  Monson Dep. 57–59; Schelsinger Decl. Ex. 2.

As principal, Thomas reported directly to the superintendent of the Marshall school district.  Thomas Decl. ¶ 4.  The superintendent supervises the entire school district and reports to the Marshall School Board ("Board").  Minn. Stat. § 123B.143, subd. 1.  The Board is composed of six elected members, with the superintendent acting as a seventh (nonvoting) member.  Minn. Stat. § 123B.09, subd. 1; Minn. Stat. § 123B.143, subd. 1.  Each year, the Board elects a chair from among its members to preside over meetings and perform other ministerial tasks.  Minn. Stat. § 123B.14, subd. 1, 2.

-2-

### A. Swope's Alleged Sexual Advance

In December 2019, defendant Bill Swope, a long-serving Board member, visited Thomas in her office at the middle school. Thomas Dep. 34–35, ECF No. 130-6; Swope Dep. 54–55, ECF No. 130-5. Thomas and Swope had been friends and colleagues for a long time, as Swope was a former principal of the elementary school and a former executive director of the school's fund-raising foundation. Swope Dep. 18:1–11, 22:1–9, 37:19–23, 38:9–14. After the two talked, Thomas walked Swope to the door of her office. Thomas Dep. 35:2–3.

When the two reached the door, Swope said, "I've always wanted to do this," and leaned in to kiss Thomas's neck. Thomas Dep. 35:3–7; Swope Dep. 54–56. In response to the kiss (or hug, as Swope would have it), Thomas threw up her arms and pushed Swope away, knocking his glasses off in the process. Thomas Dep. 35:7–9; Swope Dep. 56:7–9. Swope left immediately after he retrieved his glasses from the floor. Thomas Dep. 35:25–36:5; Swope Dep. 57:1–2.

That same afternoon, Thomas reported the incident to defendant Jeremy Williams, who is now the superintendent of the district, but who at the time was the middle school's director of curriculum and instruction. Thomas Dep. 36:10–18; Williams Dep. 45:4–12, ECF No. 130-4. Williams told Thomas that she should report the incident to then-superintendent Scott Monson if she was uncomfortable with the

interaction.  Thomas Dep. 37:20–22; Williams Dep. 45:19–24.  Thomas decided not to

report the incident, and the matter was dropped.  Thomas Dep. 37:22–23, 38:21–23;

Williams Dep. 47:15–19.

### B.  Pride Flag

Later in December 2019, Thomas decided to set up a flag display in the school

cafeteria as part of an inclusivity project.  Thomas Dep. 60:8–21.  While the students

were away on holiday break, Thomas ordered custodial staff to put up about 30 flags

reflecting students' different backgrounds, including an LGBTQ+ Pride flag.  Thomas

Dep. 61:9–62:6.  The flags—purchased with school funds—were hung high on the walls

around the circumference of the cafeteria.  Thomas Dep. 62:12–23, 63:8–15.

Students and staff returned from break on January 2, 2020, and almost

immediately controversy arose over the Pride flag.  Thomas Dep. 64:19–25.  Within a

few days, a number of staff members raised concerns about the flag to either Thomas or

Monson.  Schlesinger Decl. Exs. 9–10, 14, 15, 16; Thomas Dep. 73:23–74:23; Sullivan Decl.

Ex. I.  Thomas met with the staff members (including a union representative) to address

their concerns.  Thomas Dep. 73:17–22, 74:22–75:1; Schlesinger Decl. Ex. 13–15.

The controversy did not abate.  A parent (Grant Blomberg) emailed Thomas to

question the presence of the Pride flag, and his son began circulating a petition among

students calling for the removal of the flag.  Schlesinger Decl. Exs. 21–22; Thomas Dep.

111:23–25.  On January 7, 2020, Thomas sent an email to staff explaining the purpose of the inclusivity project and indicating that an even wider variety of flags would be going up in the near future.  Schlesinger Decl. Ex. 20.

On January 9, 2020, defendant Jeff Chapman, then-chair of the Board, was contacted at his work by Don LeClere, a local pastor who was upset about the Pride flag.  Chapman Dep. 52:24–54:12, 58:2–6, 87:7–11, ECF No. 129-1; Leclere Dep. 27:12–21, 48:7–14, 49:10–19, 50:9–15, ECF No. 129-8.  Chapman had not previously heard about the display of the Pride flag.  After talking with LeClere, Chapman left work to go to the school to "divert a crisis."  Chapman Dep. 55:4–5, 58:2–6, 61:9–15.

At the school, Chapman met with Williams and Thomas, and Monson later joined them via speaker phone.  Chapman Dep. 55:22–23, 59:5–9, 60:9–10; Thomas Dep. 44:2–10.  Chapman was "angry," "loud," and "agitated" as he demanded that the Pride flag come down "immediately."  Williams Dep. 71:20–72:12; Monson Dep. 107:7–12; Thomas Dep. 44:11–13.  Thomas opposed removing the Pride flag, but Monson ordered her to take it down by the following morning.  Chapman Dep. 55:17–19.  When Thomas asked what would happen if she refused, Monson told her that such a refusal would be "insubordination" and that "discipline would follow."  Thomas Dep. 44:24–45:2; Monson Dep. 108:3–8.

Later that afternoon, Thomas emailed Monson to inform him that she would remove all the flags—not just the Pride flag—but wanted to appeal his decision. Schlesinger Decl. Ex. 28A. Chapman likewise told LeClere after the meeting that the Pride flag would be removed. Chapman Dep. 63:9–16. A few hours later, though, Monson rescinded his order to remove the Pride flag after talking with the school district's legal counsel. Monson Dep. 110:4–9; Schlesinger Decl. Ex. 29.

That same night (January 9, 2020), Thomas encouraged some members of the community to email members of the Board in support of the Pride flag. Schlesinger Decl. Exs. 18, 31; Swope Dep. 112:4–113:9. Two days later, Chapman sent Monson an irate email, in which Chapman demanded to know if it was "appropriate" for Thomas, as a principal, to "start a letter-writing campaign" to "lobb[y] school board members." Chapman Dep. 89:16–24, 98:19–99:5.

The next few months saw a flurry of letters, voice mails, text messages, and emails concerning the Pride flag directed to the Board and school administrators. *E.g.*, LeClere Dep. 96:1–18; Schlesinger Decl. Exs. 33–34, 36, 38–41. At Board meetings in February and March, members of the community showed up in droves to speak for and against displaying the Pride flag at the school. Runchy Dep. 31:18–22, ECF No. 129-10. LeClere petitioned the Board to include other flags, such as a "straight pride flag" and a "don't tread on me" flag. Sullivan Decl. Ex. L; Schlesinger Decl. Ex. 33.

Thomas reacted to the increasing public tumult by doubling down on her support for LGBTQ+ students.  She made LGBTQ+ materials (such as rainbow stickers) available to staff, and she hung LGBTQ+ signs in her office.  Thomas Decl. ¶ 12.  On February 5, 2020, Monson addressed the Pride flag in the staff newsletter, indicating that it would remain up as part of the inclusivity project.  Schlesinger Decl. Ex. 35.  In mid-March 2020, the controversy over the Pride flag temporarily receded in the face of the COVID-19 pandemic, which closed the schools and gave rise to new controversies.  Williams Dep. 122:16–21; Thomas Decl. ¶ 13.

On June 1, 2020, the Board met in closed session, after which the Board issued a statement to the effect that the Pride flag was consistent with school policy and would not be removed.  Schlesinger Decl. Ex. 42.  Every member of the Board voted in favor of the statement, except Chapman (who abstained).  Schlesinger Decl. Ex. 43.  Monson resigned at the end of June 2020, and Williams took over as superintendent.  Monson Dep. 184:8–25; Williams Dep. 39:3–13.

### C.  Gay-Straight Alliance

After in-person classes resumed in October 2020, Thomas helped students to establish a Gay-Straight Alliance ("GSA") at the middle school.  Helgerson Dep. 21–24, ECF No. 129-22; Thomas Dep. 259:19–260:20.  Among other things, Thomas helped organizers navigate district policy and gain Board approval of the GSA.  Helgerson

Dep. 21–24; Thomas Dep. 259:19–260:20.  On the morning of December 7, 2020, Thomas

forwarded an email to school staff that announced the formation of the GSA and asked

teachers to share the announcement with their students.  Schlesinger Decl. Ex. 47;

Chapman Dep. 129:12–18.  A couple of teachers—who were also among the teachers

who had opposed the Pride flag—emailed Chapman and Thomas objecting to having to

share the GSA announcement with their students.  Schlesinger Decl. Exs. 47–48.  An

hour later, Williams emailed Thomas and asked her meet with him.  Schlesinger Decl.

Ex. 50.  When they met the following day, Williams floated the idea of Thomas leaving

her job as middle-school principal for another job within the district.  Thomas Decl.

¶ 14.  Thomas was tentatively receptive to Williams's proposal.  Thomas Dep.

179:14–180:20.

On January 25, 2021, after the faculty advisor for the GSA made a presentation

about the GSA at a staff meeting, the same group of teachers once again complained to

Williams about Thomas asking them to engage with students over the GSA, "knowing

it goes against our beliefs."  Helgerson Dep. 34:25–35:25; Schlesinger Decl. Exs. 51, 54.

A few days later, Williams received mid-year staff feedback survey results for Thomas

that included similar complaints (though the vast majority of responses were positive).

Pemberton Investigative Report ("PIR") at 6 ¶ 3, Ex. II, ECF No. 51.

*D. Investigation*

On February 5, 2021, Williams notified Thomas that she was the subject of an informal complaint and that they would need to discuss the complaint with her union representative present.  Schlesinger Decl. Ex. 55.  During the meeting, Williams told Thomas that he could not provide specifics about the complaint—because it contained only "generalities"—but Williams offered not to start a formal investigation if Thomas agreed to move to a different position within the school district.  Schlesinger Decl. Exs. 56, 59; Williams Dep. 90:5–21.  Thomas later told Williams that, as far as she was concerned, a full investigation should be conducted.  Schlesinger Decl. Exs. 56, 59; Sullivan Decl. Ex. B, ECF No. 67.

During this time, Swope privately encouraged teachers to pursue their complaints against Thomas and asked for updates on their meetings with Williams. Schlesinger Decl. Ex. 60.  On February 17, 2021, Williams met with six teachers who had complained about Thomas creating "division" at the school, but Williams was not told of any specific instances of misconduct.  Schlesinger Decl. Exs. 60, 62, 65; Williams Dep. 90:5–21, 192:11–193:17, 197:3–8; Schlesinger Decl. Ex. 66 at 5:16–18.  Instead, the teachers expressed general concerns about the "culture" at the school and general objections to Thomas pushing her personal viewpoints on staff.  Schlesinger Decl. Exs. 60, 62, 65; Williams Dep. 90:5–21, 192:11–193:17, 197:3–8; Schlesinger Decl. Ex. 66 at 5:16–18.  The

teachers' complaints mainly related to the display of the Pride flag, Thomas's promotion of the GSA, and the teachers' discomfort with being asked to discuss LGBTQ+ issues with their students. Williams Dep. 90–93, 135–138:1. Ultimately, the teachers wanted a new principal at the school. Schlesinger Decl. Ex. 62.

On February 21, 2021, Chapman emailed Williams, telling him that "this is starting to divide our school again," and that Board member Bill Mulso also wanted Thomas gone from the school. Schlesinger Decl. Ex. 63; Chapman Dep. 149:9–150:2. Meanwhile, Thomas started a new letter-writing campaign, this time asking friends and colleagues to write letters to Williams and the Board supporting her against the allegations made by the disgruntled teachers. Schlesinger Decl. Exs. 64, 86; Thomas Dep. 159:3–160:12.

On March 1, 2021, the Board held a closed session at which Williams described the complaints about Thomas. Schlesinger Decl. Ex. 66. Williams sought the Board's "advice" and "direction," but the Board did not vote on any action or motion. *Id.* at 2:22–25. Williams indicated that he intended to initiate an investigation, but needed direction on whether Thomas should be placed on leave or reassigned during that investigation. *Id.* at 15:22–16:9. On March 4, 2021, Thomas was placed on paid administrative leave, effective immediately. *Id.* at 19:20–20:3; Schlesinger Decl. Ex. 67.

The investigation, which lasted over two months, was conducted by a partner in the law firm that represented the school district.  Schlesinger Decl. Ex. 66 at 17:6–9.  Before the investigation concluded, however, Thomas filed a charge of discrimination against the school district with the Minnesota Department of Human Rights.  Schlesinger Decl. Ex. 70.  Three days later, Marshall Concerned Citizens—a small association of community members led by LeClere and Blomberg—sued the school district over the display of the Pride flag.  *Marshall Concerned Citizens v. Marshall Sch. Dist.*, Civ. No. 21-CV-1038 (WMW/KMM) (D. Minn. Apr. 22, 2021).  Before the lawsuit was filed, Chapman urged LeClere not to sue the district because "they were getting rid of the problem."  Schlesinger Decl. Ex. 52.

## E.  Discipline

The investigation concluded on May 11, 2021.  PIR at 16.  The investigator found that Thomas had created a "negative, divided, and uncomfortable work environment."  *Id.*  The investigator also concluded that Thomas had improperly solicited a letter of support from a teacher, who felt uncomfortable with Thomas's request.  *Id.* at 16–17.  The Board held another closed session to discuss the results of the investigation.  Williams Dep. 206.  On or about June 2, 2021, the district offered a payout to Thomas in return for her resignation.  Schlesinger Decl. Ex. 76.  Three weeks later, Thomas rejected

the offer, prompting district counsel to send an email to the Board members setting forth their options: either immediate termination or more protracted discipline. *Id.*

On or about June 30, 2021, Thomas was suspended for seven days without pay, removed as principal of the middle school, and assigned to an administrative position—created just for her—in a small, windowless office. Schlesinger Decl. Exs. 78, 79; Williams Dep. 164–65. On July 14, 2021, Williams issued Thomas a "Notice of Deficiency" letter and placed her on an Performance Improvement Plan ("PIP") that the Board hoped would "build up evidence . . . to pursue end of year termination in the future." Schlesinger Decl. Exs. 76, 77.

In late July 2021, Marshall Concerned Citizens settled its lawsuit. Schlesinger Decl. Ex. 72; Sullivan Decl. Ex. T. The school district agreed to take down the flag display by August 1, 2021, and a stipulation of dismissal was filed on August 3, 2021. Schlesinger Decl. Ex. 72; Sullivan Decl. Ex. T. On November 30, 2021, Thomas filed this lawsuit. ECF No. 1. Thomas continues to work for the district in her administrative role.

## II. ANALYSIS

### A. *Standard of Review*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wobig v. Safeco Ins. Co. of Ill.*, 40 F.4th 843, 847 (8th Cir. 2022) (citing *Johnson v. Safeco Ins. Co. of Ill.*, 983 F.3d 323, 329 (8th Cir. 2020)).

### B.  Title VII

Thomas brings what she describes as an "associational discrimination" claim against Marshall under Title VII. Specifically, Thomas alleges that she was discriminated against, not because *she* is in a protected class, but because she advocated on behalf of *others* who are in a protected class (LGBTQ+ students).

Title VII makes it unlawful for "an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of *such individual's* . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). To prevail on a Title VII claim, then, a plaintiff must establish that the discrimination suffered by the plaintiff was "because of" the *plaintiff's* sex. *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020). In other words, holding everything else constant, "if changing the

employee's sex would have yielded a different choice by the employer," then the

employer has made a decision "because of such individual's . . . sex." *Id.* at 659–60.

Thomas's "associational discrimination" claim thus falls outside the scope of

Title VII. Thomas alleges that she was discriminated against because she advocated on

behalf of LGBTQ+ students. If that is true, though, then changing Thomas's status as a

"straight, cisgender woman" would not "have yielded a different choice by the

employer," because Thomas's sex and sexual orientation were irrelevant to the adverse

action. In other words, the district acted against Thomas because of hostility to her

*views*, not because of hostility to her *sex*, and thus the district would have discriminated

against Thomas in exactly the same way had she been a man.

Thomas contends that most circuits have recognized associational-discrimination

claims. *See Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 272 (1st Cir. 2022) (collecting

cases). That is true, but the type of associational-discrimination claim recognized by the

circuits—unlike the type of associational-discrimination claim brought by

Thomas—involves a plaintiff who was discriminated against because of *the plaintiff's*

race or sex or other protected characteristic.[1] For example, a white man who suffers

---

[1]The exception is a line of cases from the Sixth Circuit—starting with *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000)—which hold that "a Caucasian high-level affirmative action official could bring a claim under [Title VII] for discrimination based upon his advocacy on behalf of minorities because the discrimination would be 'because of such individual's race,' where the race of the

(continued...)

discrimination because he marries a black woman would not have faced discrimination but for *his* race. *See, e.g., Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race." (emphasis in original)). Likewise, a woman who suffers discrimination because she is in a romantic relationship with another woman would not have faced discrimination but for *her* sex. *See Bostock*, 590 U.S. at 660–61 ("When an employer fires an employee because she is homosexual or transgender, two causal factors may be in play—both the individual's sex and something else. . . . But Title VII doesn't care.").

As explained above, Thomas was discriminated against because of what she advocated, not because of her sex—because of what she said, not because of who she is. Thomas's "associational" theory therefore falls outside the language of Title VII and finds no support in the cases recognizing associational-discrimination claims. Accordingly, her Title VII claim is dismissed.[2]

---

[1](...continued)
minorities for which he was advocating would be 'imputed' if you will to the Caucasian high-level affirmative action official," *id.* at 575. *Johnson* is an outlier, however, as no other circuit has adopted its "advocacy" theory. This Court finds more persuasive the majority of cases that apply Title VII as written. *See Frith*, 38 F.4th at 272 (rejecting *Johnson* because it "essentially replaces the textual 'because of such individual's race' with the atextual 'because of such individual's advocacy for protected individuals.'").

[2]Thomas has not argued that she is entitled to relief under 42 U.S.C. § 2000e-2(m).

## C. *First Amendment Retaliation*

Thomas claims that the district retaliated against her for exercising her First Amendment right to speak in support of LGBTQ+ members of the community. To establish retaliation in violation of the First Amendment, a public employee must show that she "spoke as a citizen on a matter of public concern," rather than "pursuant to [her] official duties." *Groenewold v. Kelley*, 888 F.3d 365, 371 (8th Cir. 2018) (citations omitted).

A public employee speaks pursuant to her official duties if the speech at issue "owes its existence to [her] professional responsibilities." *Id.* (quoting *Lyons v. Vaught*, 875 F.3d 1168, 1174 (8th Cir. 2017)). Determining whether speech was made pursuant to a public employee's official duties requires a practical inquiry, because official duties may embrace speech that "is not required by, or included in, the employee's job description, or [made] in response to a request by the employer." *Lyons*, 875 F.3d at 1174 (cleaned up).

Thomas insists that, when she established the inclusion project and incorporated the Pride flag into the display, she was acting as a private citizen, and not as the middle-school principal. Likewise, she insists that, when she helped to create and promote the GSA, provided LGBTQ+-friendly resources and materials to staff, and refused to incorporate LGBTQ+-marginalizing flags into the flag display, she was again acting as a

private citizen, and not as the principal of the middle school. Thomas argues that because no previous principal of her middle school had ever taken those specific actions, those actions must not have been part of her official duties.

Thomas's argument is meritless. Obviously, when Thomas used school funds to buy the flags (including the Pride flag) and ordered the custodial staff to hang them up on school property, she was acting in her capacity as the principal of the school. A private citizen cannot wander into a public school, spend public funds, give orders to public employees, and decide what is displayed on public property. Likewise, Thomas was obviously acting as the middle-school principal when she facilitated the creation of a student group and used school funds to provide resources to staff. As Thomas conceded at the hearing, a principal's professional responsibilities include curating educational displays, providing resources to staff, and facilitating the creation of student groups. The fact that a prior principal of this exact school had never curated this exact educational display, provided these exact resources to staff, or facilitated the creation of this exact student group is of no consequence. Because the speech at issue was made pursuant to her official duties, Thomas's First Amendment retaliation claim fails.

Thomas also claims that she was retaliated against for building a coalition of community members to support LGBTQ+ students, then encouraging that coalition to

contact the Board in support of the Pride flag.  Here, Thomas may have been acting as a

private citizen, and thus her speech may have been protected.  But even if Thomas's

speech was protected, she must show that her speech was a "substantial or motivating

factor" in the decision to take adverse action against her.  *Charleston v. McCarthy*, 8 F.4th

772, 779 (8th Cir. 2021) (citation omitted).

Thomas organized the letter-writing campaign in support of the Pride flag on

January 9, 2020, the same day that Chapman came to the school to demand that the flag

be removed.  Thomas points to no evidence that she continued those organizing and

lobbying efforts beyond that day.  By Thomas's own account, no adverse employment

action was taken against her until (at the earliest) February 5, 2021—over a *year* after she

engaged in the protected speech, and long after both then-superintendent Monson and

the Board had publicly affirmed her decision to hang the Pride flag.  And, even in

December 2020, Williams raised the possibility of a voluntary reassignment only after

some of Thomas's teachers began to complain about her leadership.[3]  *See Freeman v. Ace*

*Tel. Ass'n*, 467 F.3d 695, 698 (8th Cir. 2006) ("[T]he presence of intervening events

undermines any causal inference that a reasonable person might otherwise have drawn

from temporal proximity . . . .").  On these facts, no reasonable jury could find that

---

[3]Thomas has not adequately raised a "cat's paw" theory of causation, as she
raised the theory only in her reply brief (in passing and in a footnote).  Pl.'s Reply 8,
ECF No. 140.

Thomas was retaliated against for her protected speech. *See Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011) (stating that an inference of retaliation "vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months").

For these reasons, Thomas's First Amendment claim is dismissed.

### D.  Title IX

### 1.  Discrimination

Thomas's Title IX discrimination claim, like her Title VII discrimination claim, asserts that she was discriminated against because she advocated on behalf of LGBTQ students, not because of her sex.  Thomas contends that this type of associational-discrimination claim is cognizable under Title IX—even if it is not cognizable under Title VII—because Title IX prohibits discrimination "on the basis of sex," without Title VII's qualifying phrase "such individual's."  *Compare* 20 U.S.C. § 1681(a) *with* 42 U.S.C. § 2000e-2(a)(1).

Under Title IX, "no person . . . shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The courts have recognized a judicially-implied right of action under Title IX "in favor of private victims of [sex] discrimination."  *Wells ex rel.*

*Glover v. Creighton Preparatory Sch.*, 82 F.4th 586, 593 (8th Cir. 2023) (quoting *Cannon v.*

*Univ. of Chi.*, 441 U.S. 677, 709 (1979)).

In defining the contours of that implied right of action, however, courts have

consistently held that the "interpretation of Title VII properly informs [an] examination

of Title IX." *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 866 (8th Cir. 2011). In fact,

the Eighth Circuit has expressly rejected the argument—made by Thomas here—"that

because the language of the two statutes . . . is slightly different, the elements of proof

are slightly different." *Brine v. Univ. of Iowa*, 90 F.3d 271, 276 (8th Cir. 1996). Instead,

the Eighth Circuit has held that, in "employment discrimination cases, 'the Title VII

standards for proving discriminatory treatment should apply to claims arising under

Title IX.'" *Id.* (citations omitted).

In short, under binding Eighth Circuit precedent, Thomas must show that she

was discriminated against because of her own sex to recover on a discrimination claim

under Title IX. Thomas cannot do so, and thus her associational-discrimination claim

must be dismissed.

### 2. Retaliation

Thomas also claims that the district retaliated against her in violation of Title IX.

Title IX (unlike Title VII) does not expressly prohibit retaliation, but the U.S. Supreme

Court has held that "retaliation is discrimination 'on the basis of sex' because it is an

intentional response to the nature of the complaint: an allegation of sex discrimination."
*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

Because Thomas does not provide direct evidence of retaliation, her claim is
analyzed under the *McDonnell-Douglas* burden-shifting framework. *Banford v. Bd. of
Regents of Univ. of Minn.*, 43 F.4th 896, 899 (8th Cir. 2022); *see also Brine*, 90 F.3d at 276
(applying Title VII standards for proving discrimination to Title IX claims of
discrimination). To establish a prima facie case of retaliation under Title IX, a plaintiff
must demonstrate (1) that she engaged in protected activity; (2) that the federal funding
recipient took a materially adverse employment action against her; and (3) that the
protected activity was a determinative cause of the adverse employment action.
*Du Bois v. Bd. of Regents of Univ. of Minn.*, 987 F.3d 1199, 1203 (8th Cir. 2021) (citing
*Bunch v. Univ. of Ark. Bd. of Tr.*, 863 F.3d 1062, 1069 (8th Cir. 2017)); *Tyler*, 628 F.3d at
985–86. There is no dispute that the Marshall School District is a federal funding
recipient.

"[T]he conduct that is protected from retaliation by Title IX (as interpreted by
*Jackson*) is opposition to discrimination on the basis of sex." *Du Bois v. Bd. of Regents of
Univ. of Minn.*, 439 F. Supp. 3d 1128, 1137 (D. Minn. 2020). Such opposition "is generally
understood 'to encompass actions that oppose an employer's actions that are not
unlawful, as long as the employee acted in a good faith, objectively reasonable belief

that the practices were unlawful.'"  *Warmington v. Bd. of Regents of Univ. of Minn.*, 455 F. Supp. 3d 871, 886 (D. Minn. 2020) (quoting *Barker v. Mo. Dep't of Corr.*, 513 F.3d 831, 834 (8th Cir. 2008)) (cleaned up).

Thomas argues that she engaged in protected conduct by opposing discrimination against LGBTQ+ students.  Although the Eighth Circuit has not addressed the question, *Bostock* leaves little doubt that discrimination based on sexual orientation or gender identity is discrimination "on the basis of sex" for purposes of Title IX.  *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–19 (4th Cir. 2020) (applying *Bostock* to hold that discrimination on the basis of transgender identity violates Title IX); *Grabowski v. Ariz. Bd. of Regents*, 416 F.4th 1110, 1116 (9th Cir. 2023) (applying *Bostock* to hold "that discrimination on the basis of sexual orientation is a form of sex-based discrimination under Title IX"); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) ("Applying *Bostock*'s reasoning to Title IX, we have no trouble concluding that discrimination against transgender persons is sex discrimination for Title IX purposes, just as it is for Title VII purposes."); *see also* U.S. Dep't of Educ., Office of the General Counsel, *Memorandum for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights Re:* Bostock v. Clayton Cty., *140 S. Ct. 1731 (2020)*, at 5 (Jan. 8, 2021) ("Title IX also prohibits termination of an employee on the basis of sex, meaning a person's biological sex, male or female.  By analogy to

*Bostock*, terminating an employee on the basis of the employee's homosexuality or transgender status implicates that employee's sex and, thus, is at least in part discrimination on the basis of the employee's biological sex."); 86 FR 32637, 32638 (June 22, 2021) ("[T]he interpretation of sex discrimination set out by the Supreme Court in *Bostock*—that discrimination 'because of . . . sex' encompasses discrimination based on sexual orientation and gender identity—properly guides the Department's interpretation of discrimination 'on the basis of sex' under Title IX and leads to the conclusion that Title IX prohibits discrimination based on sexual orientation and gender identity.").

Thomas claims that she opposed discrimination against LGBTQ+ students by putting up the Pride flag; putting up LGBTQ+ signs in her office; making LGBTQ+ resources and materials available; helping to create and promote the GSA; disciplining students for anti-LGBTQ+ bullying; building a support network for LGBTQ+ students; and otherwise supporting LGBTQ+ students and staff. But Thomas does not point to a single instance when an LGBTQ+ student or employee was discriminated against by the school on account of his or her sexual orientation or gender identity. And presumably Thomas is not claiming that, while she was in charge of Marshall Middle School, the school was rife with Title IX violations. Rather, Thomas essentially argues that, because LGBTQ+ people have been and continue to be discriminated against in the broader

society, her general support for LGBTQ+ students and staff in her school amounted to opposition to sex discrimination for purposes of Title IX.

Thomas is mistaken. In order to recover on a Title IX retaliation claim, the plaintiff must have opposed real or perceived discrimination *by the funding recipient. See Jackson*, 544 U.S. at 173 ("Title IX prohibits sex discrimination by recipients of federal education funding."). So, for example, complaining generally about women's lack of advancement in large law firms—or about the way a particular restaurant chain requires its female servers to dress—is not conduct protected by Title IX, which prohibits sex discrimination (1) in education (2) by a recipient of federal funds. *See id.* at 178 n.2 ("[P]laintiffs may not assert claims under Title IX for conduct not prohibited by that statute."). General advocacy for an historically marginalized group—as opposed to opposing a real or perceived act of discrimination by a particular educational institution receiving federal funding—is not "opposing sex discrimination" for purposes of Title IX.

Finally, Thomas claims that she opposed discrimination against LGBTQ+ people by resisting removing the Pride flag from the display.[4] As recounted above, Thomas

---

[4]Thomas also refused requests by outside groups to include other flags in the display, as she thought the flags would marginalize LGBTQ+ students. But this too was not opposition to discrimination by an educational institution, as the perceived discrimination was that of outside groups, not the school or the district. Indeed, the Board *agreed* with Thomas's decision, and, like Thomas, rejected pressure from outside

(continued...)

initially resisted removing the Pride flag when Chapman demanded that it be taken down in January 2020, and then said that she would remove all of the flags after Monson threatened her with disciplinary action. (As also recounted above, Monson soon changed his mind, and the Pride flag was not removed.)

Even assuming that Thomas's opposition to Chapman's demand and Monson's directive constituted opposition to sex discrimination for purposes of Title IX, Thomas still cannot establish a prima facie case of retaliation. No reasonable jury could find that Thomas's resistence to removing the Pride flag in *January 2020* was the "determinative cause" of the adverse employment actions taken against Thomas beginning in *February 2021*. Not only were the refusal and the adverse actions separated by more than a year, *see Tyler*, 628 F.3d at 986 ("As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation."), but during that year both the superintendent and the Board *supported* Thomas's decision not to remove the Pride flag. Because Thomas cannot establish a casual connection between her resistance to removing the Pride flag and her much later discipline, her Title IX retaliation claim is dismissed.[5]

_____

[4](...continued)
groups to include the additional flags. Schlesinger Decl. Ex. 42.

[5]Similarly, Thomas filed a discrimination charge with the Minnesota Department of Human Rights on April 19, 2021, weeks *after* she had been placed on administrative
(continued...)

*E.  MHRA*

The Court has dismissed the claims over which it has original jurisdiction.  As directed by the Eighth Circuit, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.  28 U.S.C. § 1367(c)(3); *Barstad v. Murray Cnty.*, 420 F.3d 880, 888 (8th Cir. 2005) (stating that courts should ordinarily decline supplemental jurisdiction when all original-jurisdiction claims have been eliminated before trial).  The state-law claims are therefore dismissed without prejudice.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Plaintiff's motion for summary judgment [ECF No. 124] is DENIED.

2.      Defendants' motion for summary judgment [ECF No. 111] is GRANTED as follows:

 a.      Counts 3 through 6 of the amended complaint [ECF No. 35] are DISMISSED WITH PREJUDICE AND ON THE MERITS.

 b.      All other claims are DISMISSED WITHOUT PREJUDICE.

---

[5](...continued)
leave pending the results of the investigation into the complaints against her.  Thus, Thomas's filing of the charge could not have been a "determinative cause" of the investigation and subsequent discipline.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  September 25, 2024                     s/Patrick J. Schiltz
                                               Patrick J. Schiltz, Chief Judge
                                               United States District Court